(Nos. 56972, 56990 cons.—

CHARLOTTE HAMMOND, Appellant and Appellee, v. NORTH AMERICAN ASBESTOS CORPORATION, Appellee and Appellant.

*Opinion filed May 18, 1983.—Rehearing denied September 30, 1983.*

Heyl, Royster, Voelker & Allen, of Peoria (William J. Voelker, Jr., Frederick P. Velde, and Judy A. Schieber, of counsel), for appellant.

James Walker, Ltd., of Bloomington, for appellee.

JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Charlotte Hammond, the wife of an asbestos worker who contracted asbestosis, brought an action against defendant, North American Asbestos Corporation, for loss of consortium based on theories of strict liability in

tort and wilful and wanton negligence. After a jury trial, the circuit court of McLean County entered judgment on the verdict awarding plaintiff $125,000 in compensatory and $375,000 in punitive damages. The appellate court affirmed the compensatory damages, but reversed the punitive damages, reasoning that such an award is not recoverable in a loss-of-consortium action. (105 Ill. App. 3d 1033.) Both parties petitioned for leave to appeal, and we granted both petitions.

While the parties raise numerous questions for review, only four need be addressed: (1) Did the appellate court err in holding plaintiff had proved a cause of action sounding in strict liability? (2) Was plaintiff's action barred by the statute of limitations? (3) Did plaintiff waive the sufficiency of defendant's post-trial motion by not objecting to this issue when raised in the appellate court? (4) Should punitive damages have been awarded in this case?

In 1953, defendant was organized as a wholly owned subsidiary of Cape Asbestos Company, Ltd. (Cape), a British corporation which mined, milled and packaged raw asbestos fiber in South Africa for sale worldwide. That same year, plaintiff's husband, Charles Hammond, was employed by Union Asbestos and Rubber Company (UNARCO) at its Bloomington, Illinois, plant. UNARCO purchased and processed raw asbestos fiber into various insulating products containing asbestos.

In April of 1971, a physician diagnosed Hammond as having asbestosis and recommended he stop working at the UNARCO plant. Plaintiff filed her loss-of-consortium action in March of 1975. She voluntarily dismissed the case on March 3, 1980, but refiled on March 14, 1980, pursuant to section 24 of the Limitations Act (Ill. Rev. Stat. 1979, ch. 83, par. 24a). Count I was based on strict liability in tort, alleging defendant sold an unreasonably dangerous product without providing a warning of the dangers associated with its use. Count II alleged defendant wilfully and

wantonly failed to provide such warning. The complaint averred that defendant sold raw asbestos fiber and certain asbestos products to UNARCO; that defendant knew the dangers associated with exposure to asbestos; that asbestos workers at UNARCO lacked knowledge of the potential dangers of asbestos; and that defendant failed to warn of such danger.

At trial, Charles Hammond and two of his co-workers testified that they handled, opened and processed bags of raw asbestos, thereby generating asbestos dust. They stated there were no printed warnings of the detrimental effects of asbestos dust either on the bags or in the plant and that they never knew of the danger. The testimony of a former UNARCO director of personnel confirmed the lack of warnings on the bags and in the plant.

Numerous documents were admitted into evidence. Minutes of the 1954-55 meetings of an asbestos manufacturer's trade association showed that studies of asbestosis and related diseases had been conducted and knowledge of the dangers of asbestos dust existed as early as 1930. Representatives from both UNARCO and defendant had attended these meetings. Defendant's annual reports to the Secretary of State of Illinois from 1955 to 1961 listed defendant's business as the manufacture and sale of asbestos.

Many of the documents were submitted by plaintiff to prove that defendant sold large quantities of raw asbestos to Calabrian Industries (Calabrian), a barter corporation. Calabrian traded the asbestos to the United States government for other commodities through barter contracts. By the terms in a letter of agreement between defendant and Calabrian, defendant agreed to deliver to the Commodity Credit Corporation (CCC) of the United States government, for Calabrian's account, all of the asbestos required under Calabrian's barter contracts. Millions of pounds of defendant's asbestos were delivered to the United States for its critical materials stockpile under these contracts.

Several years later, the government decided to reduce its asbestos stockpile. General Service Administration (GSA) reports indicate large portions of raw asbestos from the stockpile which had originated from Cape's mines were sold to UNARCO's Bloomington plant for its use.

Plaintiff called a former UNARCO employee who testified she was familiar with UNARCO purchasing and receiving orders. She identified orders indicating purchase of asbestos from both defendant and the stockpile and receipt of the asbestos at the UNARCO Bloomington plant. On cross-examination, she was shown certain documents and from them could only identify 12,500 pounds of raw amosite asbestos delivered directly to the UNARCO Bloomington plant from defendant.

Joan Holtze, a former employee of defendant from 1953 until 1978, testified defendant was incorporated to be a contact point in North America for Cape customers. While admitting defendant made a few direct sales of asbestos, she said it primarily functioned as a message relay center between Cape and Cape's North American asbestos customers. She acknowledged defendant received 2½% commission on all of the Cape's asbestos fiber contract sales in North America. She also stated that Robert Cryor was defendant's president from 1953 until his death in 1970 and that Cryor had worked for UNARCO prior to 1953. Plaintiff then submitted several of UNARCO's occupational disease files from approximately 1939 until 1953 which revealed that Cryor had been involved in the disposition of many of UNARCO's asbestos-related claims.

Portions of the deposition testimony of Dr. Richard Gaze, Cape's chief scientist, were read to the jury. He was employed by Cape in 1943, was later promoted to chief scientist, and became an executive director in 1961. He was also a member of defendant's board of directors. On the day he was employed at Cape, he became aware that asbestos, in its various forms, was dangerous to human

health. He stated there was nothing preventing placing a label on the asbestos bags, that he could have recommended it, but that it was just not done. He also testified defendant participated in the sale of asbestos from the South African mines. On cross-examination, he said the incidents of asbestosis from 1940 until about 1960 were thought to be related to the higher dust concentrations found in asbestos plants prior to 1940. He stated it was thought that reduced concentrations of dust would decrease the dangers of working with asbestos.

Plaintiff also read portions of the former testimony of Dr. Geritt Sheppers, who had testified at a previous trial in this case. Dr. Sheppers had studied and examined workers at the South African asbestos mines in 1949 and found nearly all had asbestosis. He indicated asbestosis was well known in the medical and scientific community throughout Europe and the United States as early as 1940. On cross-examination, he admitted a study in 1949 had concluded that lower levels of asbestos-dust exposure were thought to be safe and would not lead to asbestos disease.

Defendant's expert testified there was knowledge in the asbestos industry since 1920 that high concentrations of asbestos dust caused asbestosis. However, he stated that threshold dust levels were established in the industry subsequent to that time which were thought to be safe. He indicated the industry thought these levels would diminish the incidence of asbestosis.

One of defendant's former presidents testified that defendant neither accepted any orders or contracts for asbestos on behalf of Cape nor had authority to do so. He acknowledged, though, that he represented defendant as its attorney in the preparation and negotiation of the agreement with Calabrian to supply asbestos under the barter contracts. He indicated defendant never had physical possession of the asbestos fiber that was delivered pursuant to those contracts.

On cross-examination, when asked if the government specifications in the barter contracts prevented defendant from placing a warning label on the bags, he stated "it might have." He admitted, though, that defendant never inquired of the government if it could place warnings on the asbestos bags, and never placed warnings on bags sold to nongovernment purchasers.

Defendant contends plaintiff failed to prove a cause of action in strict liability. In *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 621, this court adopted strict liability in tort as expressed in the Restatement (Second) of Torts, section 402A (1965):

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Initially, defendant argues raw asbestos fiber is not a product within the meaning of section 402A. Further, since raw asbestos fiber is not sold to consumers without being further processed and combined with other materials, defendant maintains it should not be considered a "product" for the purpose of strict liability in tort.

While the Restatement does not define the term "product," comment *e* of section 402A provides:

"Normally the rule stated in this Section will be applied to articles which already have undergone some proc-

essing before sale, since there is today little in the way of consumer products which will reach the consumer without such processing. The rule is not, however, so limited, and the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to the liability here stated." (Restatement (Second) of Torts, sec. 402A, comment *e*, at 350 (1965).)

Citing comment *e*, this court concluded that human blood, while not a manufactured article of commerce, was to be considered a "product" within the meaning of section 402A. *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443, 447.

The appellate court has said that a particular item will be considered a product if to do so will effectuate the policy basis for imposing strict liability in tort. (*Lowrie v. City of Evanston* (1977), 50 Ill. App. 3d 376.) Both the appellate court and the Restatement have recognized that the term "product" includes items which have not been processed or manufactured before they are sold. Otherwise, substances such as water, wood (*Housman v. C. A. Dawson & Co.* (1969), 106 Ill. App. 2d 225 (lumber is a product)), anything in the natural state, and all living things, including human blood (*Cunningham*), would be excluded. Thus, the fact that raw asbestos fiber is processed before being sold is not determinative of its status as a product.

The drafters of section 402A took no stand on whether raw materials should be considered products. Comment *p* indicates that the mere fact a product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability.

"If, for example, raw coffee beans are sold to a buyer who roasts and packs them for sale to the ultimate consumer, it cannot be supposed that the seller will be relieved of all liability when the raw beans are contaminated with arsenic, or some other poison. *** On the other hand, the manufacturer of pigiron, which is capable of a wide variety of uses, is not so likely to be held to

strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer. The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes." Restatement (Second) of Torts, sec. 402A, comment *p*, at 357 (1965).

We adopt the rationale of the appellate court in this case wherein it stated:

"[W]e conclude that raw asbestos is a product within the meaning of the Restatement. Although raw asbestos is processed before it is ultimately sold to consumers, raw asbestos and not some manufactured article caused the harm in this case. There was no change in the condition of the asbestos from the time it was sold until it reached the 'ultimate user,' Charles Hammond. Moreover, the argument that but for the manufacturing process the asbestos would not have been altered begs the questions.

The evidence showed clearly that handling asbestos in any form produces dust. Liability may be imposed in a products case if the injury results from a condition of the product and the condition is unreasonably dangerous and existed when the product left the defendant's control. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368.) The proclivity of raw asbestos to give off dust was certainly a condition that existed when the product left defendant's control." 105 Ill. App. 3d 1033, 1037.

Defendant next contends raw asbestos fiber is not unreasonably dangerous. At trial, Charles Hammond and two of his co-workers testified that they handled, opened and processed bags of raw asbestos, thereby generating asbestos dust. Further evidence established the hazards associated with handling asbestos were known in the industry at least by 1940. Hammond and his co-workers testified that asbestos workers were unaware of the danger of inhaling asbestos dust. Moreover, there was evidence which indicated defendant's president knew the workers did not realize the danger.

The failure to warn of a product's dangerous propensities may serve as the basis for holding the manufacturer or seller strictly liable in tort. (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 29.) A product with inherent dangers may be found defective and unreasonably dangerous to the user or consumer if the manufacturer or seller fails to adequately warn of the potential risks or hazards associated with its use. (See *Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, 221; *Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 30.) Under the circumstances presented in this case, the jury could well conclude that defendant's asbestos was unreasonably dangerous.

Defendant next argues it was not a seller as contemplated by section 402A. Defendant maintains it acted only as a broker by merely facilitating and servicing its parent corporation's contracts for the sale of asbestos. Defendant further contends it never had control over the asbestos.

In a products liability action, all persons in the distributive chain are liable for injuries resulting from a defective product, including suppliers, distributors, wholesalers and retailers. (*Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206, 214.) Imposition of liability upon these parties is justified on the ground that their position in the marketing process enables them to exert pressure on the manufacturer to enhance the safety of the product. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 344.) Regardless of the nature of the commercial transaction and even though he does not create the defect, a seller who puts a defective product into the stream of commerce may still be held strictly liable to an injured user. *Crowe v. Public Building Com.* (1978), 74 Ill. 2d 10, 13.

There was ample evidence from which the jury could conclude defendant's role in marketing the asbestos was sufficient to support liability under a strict liability theory. Indeed, in its letter to Calabrian, defendant agreed to sell

to Calabrian and deliver to the CCC for Calabrian's account, all of the asbestos required under the barter contracts. In addition, defendant's president represented to CCC:

> "No other firm or individual is authorized to offer any Amosite or Blue Crocidolite asbestos produced by our parent organization, The Cape Asbestos Co. Ltd., London, or by any of its affiliated companies.
>
> \*\*\* For your guidance, we wish to mention that The Cape Asbestos Co. Ltd. and its affiliates, while producing approximately 90 per cent of the world's supply of all grades of amosite asbestos, are virtually the sole producers of the longer fiber grades meeting the Stockpile specification."

Nevertheless, defendant asserts plaintiff could trace only 12,500 pounds of asbestos directly from defendant to UNARCO, an amount representing only about 2½ days' worth of production. Comparing the 2½ days to the 18 years Hammond worked at UNARCO, defendant maintains its asbestos could not have contributed anything more than a *de minimis* role in causing Hammond's disease.

The evidence does not sustain defendant's position. Admitted documents show that millions of pounds of defendant's asbestos were sold under the barter contracts to the stockpile. GSA records indicate that the lot numbers of well over a million pounds of asbestos shipped from the stockpile to the UNARCO Bloomington plant matched lot numbers for asbestos originating from the barter sales.

Defendant next maintains its compliance with government specifications for the marking of asbestos bags under the Calabrian barter contracts relieved it of a duty to warn. At trial, defendant argued the government specifications precluded placing a warning on the bags.

This position is without merit. The specification it relies on for this defense read in pertinent part: "The bags shall not carry a security classification or any marking, other than the contract number, indicating National Stockpile

ownership." In response to plaintiff's motion *in limine,* the trial judge ruled the specification did not preclude defendant from placing a warning on the bags and therefore as a matter of law this was not a defense to plaintiff's action. The court did allow defendant to present evidence that it complied with the government contract specifications. This ruling was proper. Defendant's own witness, when asked whether the specification precluded placing a warning on the bags, answered "it might have." Furthermore, defendant never placed warnings on bags sold to nongovernment purchasers, including UNARCO. Under these circumstances, defendant cannot rely on this defense as a matter of law.

Defendant also contends it did not have a duty to warn in this case because it sold the asbestos to sophisticated purchasers who had as much or more knowledge of the dangers associated with the asbestos than it had. Defendant argues it was entitled to rely on an employer/purchaser such as UNARCO to give the necessary warnings to its employees and on the government to warn purchasers of asbestos from the stockpile.

We disagree. The evidence established that defendant knew of the dangerous propensities of asbestos but chose not to warn of the hazard. In strict liability, sellers are liable not just to those in privity to whom they sell their products, but also to the ultimate user or consumer. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 617.) Moreover, a manufacturer is under a nondelegable duty to produce a product which is reasonably safe. (*Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 368.) Given the facts in this case, defendant could not expect or rely on others to intervene and make its product safe.

Defendant asserts that plaintiff's loss-of-consortium action is derivative of her husband's personal injury claim. Since his claim was barred by the two-year statute of limitations (see Ill. Rev. Stat. 1973, ch. 83, par. 15) when her

claim was filed, defendant argues plaintiff's loss-of-consortium action is also barred. In 1975, when this action was first filed, loss-of-consortium suits were governed by the five-year statute of limitations. (*Mitchell v. White Motor Co.* (1974), 58 Ill. 2d 159, 163; see *Mitchell v. United Asbestos Corp.* (1981), 100 Ill. App. 3d 485, 503-04.) Since plaintiff's action was filed within five years of the date the cause of action accrued, it was timely filed.

Defendant next argues the compensatory award was excessive. It maintains it was a result of the erroneous submission of a punitive damages verdict to the jury and should therefore be reversed. We disagree. Plaintiff presented evidence of medical expenses of $33,000. Her husband was 54 years old and in declining health at the time of the trial. His physician testified his health would continue to deteriorate, requiring further substantial medical expenses. Undoubtedly this would also negatively impact on their marital relationship. Under these circumstances, the jury's compensatory award of $125,000 for plaintiff's loss of consortium was fair and supported by the evidence.

Plaintiff, in her cross-appeal, contends the appellate court should not have reversed the punitive award, because defendant failed in its post-trial motion to specifically raise the issue of the availability of punitive damages in a loss-of-consortium action. Defendant maintains it did sufficiently raise the issue. Defendant argues plaintiff is estopped from challenging in this court the sufficiency of defendant's post-trial motion.

Where the appellant in the appellate court fails to raise an issue in that court, this court will not address it. (*Clore v. Fredman* (1974), 59 Ill. 2d 20, 28.) An appellee in the appellate court (plaintiff here) may raise issues in this court which were not presented to the appellate court to sustain the judgment of the trial court. (*Shaw v. Lorenz* (1969), 42 Ill. 2d 246, 248.) However, he is "required to defend against the questions raised and the issues presented by

the appellant in [the appellate] court." (*Mueller v. Elm Park Hotel Co.* (1945), 391 Ill. 391, 399.) Here, defendant did raise the issue in the appellate court, but plaintiff failed to respond. As evidenced at oral argument, plaintiff admitted to this fact. The issue was therefore waived.

Alternatively, plaintiff argues the appellate court erred in concluding that punitive damages are not allowed in an action for loss of consortium. Citing *Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, plaintiff maintains this court already has approved of an award for punitive damages in an action for injury to a spouse.

In *Churchill*, a wife brought an action individually under the Public Utilities Act (Ill. Rev. Stat. 1969, ch. 111²/₃, par. 77) and as administrator of her deceased husband's estate under the Wrongful Death Act (Ill. Rev. Stat. 1969, ch. 70, par. 1 *et seq.*) for damages she allegedly suffered as a result of her husband's death at a train-crossing accident. Under the Public Utilities Act (Act), plaintiff sought compensatory damages in one count and punitive damages in another. The jury determined that plaintiff individually suffered $1,600 in pecuniary damages and awarded her that amount. It also awarded plaintiff $600,000 in punitive damages on the other count.

This court upheld both awards, saying the Act "expressly authorizes additional recovery by way of punitive damages *to any person affected* by defendant's wilful and wrongful conduct." (*Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 140.) The court reiterated that plaintiff sought punitive damages directly under the Act on the basis of the financial loss she incurred and was therefore a person affected by defendant's wilful misconduct.

This court clearly emphasized that its decision allowing punitive damages merely coincided with the legislative intent expressed in the Act and that it should not be interpreted as either condemning or advancing recovery of punitive damages in tort cases. *Churchill*, therefore, did not

approve of an award of punitive damages in a common law action for loss of consortium as plaintiff suggests.

Plaintiff next argues the appellate court erred in focusing on the status of the plaintiff in reversing the punitive award. She maintains the purpose of punitive damages is not compensation of the plaintiff but punishment and deterrence of defendant and others from committing like offenses in the future. Plaintiff posits the focal point of our analysis should be whether the deterrent effect of punitive damages can be achieved in this particular case.

While the purpose of punitive damages is punishment and deterrence, the initial question to be answered is whether the facts and circumstances of the particular case justify their imposition; this is a question of law. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186; *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 87.) "Because of their penal nature, punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 188.

Prior to the appellate decision in the instant case, no court in this State had decided whether punitive damages could be awarded in an action for loss of consortium. However, other jurisdictions have concluded that punitive damage awards are not recoverable in loss-of-consortium actions. *Fireman's Fund American Insurance Co. v. Coleman* (Ala. 1980), 394 So. 2d 334; *Moran v. Stephens* (Fla. App. 1972), 265 So. 2d 379; *Hughey v. Ausborn* (1967), 249 S.C. 470, 154 S.E.2d 839. See generally Annot., 25 A.L.R.3d 1416 (1969); 22 Am. Jur. 2d *Damages* sec. 254 (1965); 41 Am. Jur. 2d *Husband and Wife* sec. 455 (1968).

In each of the above cases, the injured party had already been awarded compensatory and punitive damages. The spouse then sought both compensatory and punitive damages in the loss-of-consortium action. The courts refused to sanction a second punitive damage award

against the defendant. Such an additional award would not serve to punish or deter the defendant who had already been punished in the first action. Rather, it would clearly result in a double windfall to the injured party and the spouse. Further, the underlying rationale for denying punitive damages in loss-of-consortium suits, and the one we adopt in this case, is that the injury is "indirect," or derivative in nature, and recovery in such actions is intended only as compensation.

We have reviewed the record with regard to defendant's other alleged trial errors and agree with the appellate court that no reversible error occurred.

For the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE UNDERWOOD took no part in the consideration or decision of this case.