MARK GRAHAM, Plaintiff-Appellant, v. BOSTROM SEATING, INC., *et al.*, Defendants-Appellees.

Fifth District    No. 5—08—0409

Opinion filed January 11, 2010.

Thomas G. Maag and Brian M. Wendler, both of Wendler Law, P.C., of Edwardsville, for appellant.

Stephen M. Szewczyk, of Reed, Armstrong, Gorman, Mudge & Morrissey, of Edwardsville, for appellee Cassens & Sons, Inc.

No brief filed for other appellees.

JUSTICE WEXSTTEN delivered the opinion of the court:

The plaintiff, Mark Graham, appeals the Madison County circuit court's grant of a summary judgment in favor of the defendant, Cassens & Sons, Inc. (CS). The circuit court granted a summary judgment in favor of CS because it found CS was not in the chain of distribution for the sale of the vehicle-hauler truck upon which the plaintiff's claims arose and was therefore not liable under the theory of products liability.[1] The plaintiff raises three points on appeal: (1) that the circuit court erred in finding that CS was not within the chain of distribution, (2) that as a matter of Illinois law, "brokers" and "facilitators" are liable for products liability claims, and (3) that even if a "facilitator" or "broker" is not liable under Illinois law, there is a genuine issue of material fact about whether CS would even so qualify. Because we find that a question of fact exists about whether CS was in the chain of distribution for the sale of the truck at issue, we do not address the remaining points.

## FACTS AND PROCEDURAL BACKGROUND

In the plaintiff's complaint, he claimed that he was injured while using a 1997 International truck equipped with a defective seat—identified as truck number 4533 and trailer number 4534 (the truck)—in the Cassens Transport Company (CT) fleet. The complaint alleged that CS "served as a distributor and seller of the truck in question," that CS "was in a position to make the truck reasonably safe," that CS was "aware at all times prior thereto of the defects and/or potential for injury arising from the placement of the truck in question into the stream of commerce," and that CS "participated in the placement of the truck in question into the stream of commerce and profited, either directly or through channeling of savings for profits to its affiliated corporations or its board of directors/stock owners."

---

[1]The plaintiff's complaint against CS sounded in three counts: (1) products liability, (2) negligence, and (3) breach of warranty. In its order, however, the circuit court did not treat these distinctive claims as being materially different, and on appeal, the parties have only briefed the products liability count. Thus, we only address that claim. See 210 Ill. 2d R. 341(h)(7) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

CS answered the complaint and then filed a motion for a summary judgment,[2] along with a memorandum in support thereof. In its motion for a summary judgment, CS contended that its role in the purchase of the truck in question "was clerical and passive and can be compared to that of an escrow agent or a title service," that its "only role with regard to the [truck] complained of by [the] plaintiff was as a facilitator of the purchase by [CT]," that "[a]s a facilitator, [CS] cannot be considered a 'seller' of the product and thus can have no liability under any sort of warranty theory," and that CS "did not even have possession of the [truck] in question and had no knowledge of its condition[ ] and had nothing to do with the Bostrom seat installed on the rig."

CS made similar contentions in its memorandum in support of its motion for a summary judgment. CS contended that it was not a true seller or distributor of the truck in question but, rather, was a "paper shuffler" or facilitator who assisted CT in acquiring the truck by providing routine title and transactional services, that CT did not need CS to order the truck, that CS's "participation in the transaction

---

[2]We note that the original record submitted on appeal did not contain CS's motion for a summary judgment or the attachments thereto but did contain the memorandum in support thereof and its corresponding attachments. According to Supreme Court Rule 329 (210 Ill. 2d R. 329), we take the record on appeal "as true and correct unless shown to be otherwise." Despite this and the fact that neither party notified this court of the omission of the motion for a summary judgment, a disagreement arose between the justices of this court about whether the record accurately disclosed what occurred in the circuit court. As a result, this court, upon its own motion pursuant to Supreme Court Rule 329, entered an order directing the plaintiff, in substance, to either supplement the record or file a statement that the motion for a summary judgment cannot be found or was never filed. Subsequently, the motion for a summary judgment and its corresponding attachments were filed. We note that while it was the plaintiff's duty to furnish a complete record on appeal (*Sandberg v. American Machining Co.*, 31 Ill. App. 3d 449, 452 (1975)), we find it inexplicable why neither party notified this court that the very motion upon which this appeal was taken was not included in the record. Nevertheless, because a controversy arose, this court settled it, and the record was made to conform to the truth. See 210 Ill. 2d R. 329 ("Material omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court, either before or after the record is transmitted to the reviewing court, or by the reviewing court or a judge thereof. Any controversy as to whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by that court and the record made to conform to the truth").

was not indispensable or mandatory, as the trailer[3] in issue could have been purchased directly from International Truck by any person or entity in Illinois," that it never had possession of the truck, and that it made no profit from the sale of the truck.

CS attached four exhibits to its motion for a summary judgment: (1) an invoice, dated October 24, 1996, from Navistar International Transportation Corp. (International), for the truck in question, reflecting CS as the buyer for $60,423, indicating that it was ordered for CT and stating that it was shipped to Cottrell, Inc., (2) a CS invoice, dated January 6, 1997, showing a sale of the subject truck for $60,423 from CS to CT, (3) a certificate of origin from International, dated August 29, 1996, for the truck in question, with a second, mostly illegible page that names CS as the purchaser, and (4) an affidavit from Clarence Brown, CS's vice president and general comanager.

The plaintiff filed a response to CS's motion for a summary judgment, and the plaintiff attached 50 documents from various cases involving CS. After a hearing on the matter, the circuit court granted a summary judgment in CS's favor, finding that CS "was not in the chain of distribution." The plaintiff appeals.

## STANDARD OF REVIEW

Our review of a summary judgment is *de novo*. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). "The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine issue of material fact exists." *Williams*, 228 Ill. 2d at 417. The burden is on the movant to demonstrate that there are no genuine issues of material fact (*Guese v. Farmers Inter-Insurance Exchange*, 238 Ill. App. 3d 196, 200 (1992)), and "[we] must construe the evidence strictly against the movant and liberally in favor of the nonmoving party" (*Carollo v. Al Warren Oil Co.*, 355 Ill. App. 3d 172, 179 (2004)). "A triable issue precluding summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Williams*, 228 Ill. 2d at 417. A summary judgment is a drastic means of disposing of litigation, and it should only be granted where it is clear and free from doubt that the moving party is entitled to the remedy. *Williams*, 228 Ill. 2d at 417. With these principles in mind, we conclude that the circuit court erroneously granted a summary judgment to CS.

---

[3]Throughout CS's memorandum in support of its motion for a summary judgment and the attachments thereto, including Clarence Brown's affidavit attached to the motion for a summary judgment, CS and Brown refer to a trailer, although the plaintiff's complaint only alleges liability based upon the truck in question.

## ANALYSIS

The plaintiff contends that under *Hammond v. North American Asbestos Corp.*, 97 Ill. 2d 195 (1983), a genuine issue of material fact exists—specifically, whether CS was in the chain of distribution when there was evidence presented that CS ordered the truck, acquired title to the truck, and sold the truck. CS counters by arguing, "Strict liability should be assessed only against those defendants who satisfy the policy considerations that lie beneath the strict liability doctrine." CS argues, "[S]trict liability should apply mainly to those who: (1) make profits or other benefits from the transaction and (2) *** are in a position to exert pressure on the manufacturer to modify the product."

In *Hammond*, the Illinois Supreme Court held, "In a products liability action, all persons in the distributive chain are liable for injuries resulting from a defective product, including suppliers, distributors, wholesalers[,] and retailers." *Hammond*, 97 Ill. 2d at 206. The court reasoned, "Imposition of liability upon these parties is justified on the ground that their position in the marketing process enables them to exert pressure on the manufacturer to enhance the safety of the product." *Hammond*, 97 Ill. 2d at 206.

The ability to exert pressure on the manufacturer, however, is not the only consideration courts in Illinois have considered for imposing strict liability in product liability actions on manufacturers, sellers, suppliers, wholesalers, distributors, and even lessors. See *Hebel v. Sherman Equipment*, 92 Ill. 2d 368, 378 (1982). "Rather, *** liability arises from the same combination of considerations that underlie the doctrine of strict products liability generally: that the loss caused by unsafe products should be borne by those who create the risk of harm by participating in the manufacture, marketing[,] and distribution of unsafe products [and by those] who derive economic benefit from placing [the products] in the stream of commerce ***." *Hebel*, 92 Ill. 2d at 378-79. "Even parties who are not within the actual chain of distribution, but who play an integral role in the marketing enterprise of an allegedly defective product and participate in the profits derived from placing the product into the stream of commerce, are held liable under the doctrine of strict liability." *Bittler v. White & Co.*, 203 Ill. App. 3d 26, 29-30 (1990). "[S]trict liability arises[ ] not because of the defendant's legal relationship with the manufacturer or with other entities in the manufacturing-marketing system, but because of its 'participatory connection, for [its] personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product.' " *Hebel*, 92 Ill. 2d at 379, quoting *Kasel v. Remington Arms Co.*, 24 Cal. App. 3d

711, 725, 101 Cal. Rptr. 314, 323 (1972). Strict liability applies to all the elements in the distribution system. *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill. 2d 339, 344 (1969).

As the Illinois Supreme Court has explained:

"A seller who does not create a defect, but who puts the defective product into circulation, is still responsible in strict liability to an injured user. Because the ultimate loss will ordinarily be borne, through indemnification, by the party that created the defect, the public policy concern is really who, between the injured user and the seller, should bear the initial loss. The seller is in a position to prevent a defective product from entering the stream of commerce. The seller may either adopt inspection procedures or influence the manufacturer to enhance the safety of a product. Moreover, the seller is generally better able to bear and distribute any loss resulting from injury caused by a defective product." *Crowe v. Public Building Comm'n*, 74 Ill. 2d 10, 13-14 (1978), citing Restatement (Second) of Torts §402A, Comment *c*, at 349-50 (1965).

Here, the record contains a certificate of origin from International for the truck in question that names CS as the purchaser, an invoice from International reflecting that CS was the buyer of the truck in question for CT, and an invoice from CS indicating that it sold the same truck to CT approximately two months later. This evidence alone, construed strictly against CS and liberally in favor of the plaintiff, creates a question of material fact—whether CS participated in the chain of distribution for the truck in question. This is consistent with the policy consideration that the loss caused by unsafe products should be borne by those who create the risk of harm by participating in the distribution of unsafe products. See *Hebel*, 92 Ill. 2d at 378-79; see also *Hammond*, 97 Ill. 2d at 206 ("Regardless of the nature of the commercial transaction and even though he does not create the defect, a seller who puts a defective product into the stream of commerce may still be held strictly liable to an injured user"). By purchasing the truck and selling it to CT, CS was directly involved in the distribution of the truck, and we find that this "participatory connection," at a minimum, creates a material question of fact about whether CS should be held strictly liable.

Nevertheless, CS contends that it should not be held strictly liable because it did not profit from the sale of the truck and was not in a position to exert pressure on International to modify the truck. It argues that its only role in the sale of the truck was that of a "facilitator" or "paper shuffler" and that, therefore, it should not be held strictly liable. In support, CS contends that although brokers, financial lessors, auctioneers, and installers may technically be parts of the

distributive chain, nearly all the courts which have adopted the Restatement (Second) of Torts, section 402A, including Illinois (*Suvada v. White Motor Co.*, 32 Ill. 2d 612, 621 (1965)), have held them not to be strictly liable in products liability cases. The only Illinois case CS cites in support of this argument is *Alvarez v. Koby Machinery Co.*, 163 Ill. App. 3d 711 (1987). We disagree and find that material questions of fact exist about what exactly CS's role was in purchasing this truck.

The Restatement (Second) of Torts, section 402A, provides, in relevant part, as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product[ ] and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." Restatement (Second) of Torts §402A, at 347-48 (1965).

In *Alvarez*, the plaintiff sued F.A. Ziegler Company (Ziegler), a manufacturer's representative, which attempted to sell the plaintiff's employer a new mill manufactured by McNeil Akron Corp. The plaintiff's employer declined but indicated that it wanted to buy a used Koby mill. Ziegler did not carry or sell Koby mills but learned of one for sale in Florida. Ziegler sent for the machine's specifications and price and forwarded this to the plaintiff's employer. Ziegler then agreed to inspect the gearbox for the plaintiff's employer and went to Florida to do so. Ziegler was not compensated for its inspection, but the plaintiff's employer did pay for its expenses. Ziegler made no recommendations to the plaintiff's employer regarding any modifications to make, did not participate in the negotiations for the sale of the Koby mill, did not participate in the installation of the mill, and received no compensation in connection with the sale of the mill. The trial court found that Ziegler's conduct could not be characterized as placing the mill into the chain of distribution and that, thus, Ziegler could not be held strictly liable. *Alvarez*, 163 Ill. App. 3d at 713-14.

The First District Appellate Court agreed, rejecting the plaintiff's contention that future goodwill with a current client was a sufficient economic benefit to hold Ziegler strictly liable. *Alvarez*, 163 Ill. App. 3d at 715. The court stated that Ziegler's major role was to inform the plaintiff's employer that the mill was for sale and that this was too remote a role to be a sufficient basis for imposing strict liability. *Alvarez*, 163 Ill. App. 3d at 715. The court pointed out that there are

many parties who may be related to the general economic system but not directly related to the distributive process and not intended to be defendants in a products liability action. *Alvarez*, 163 Ill. App. 3d at 716. "As examples, the court [in *Harms v. Caterpillar Tractor Co.*, 80 Ill. App. 3d 262 (1980),] cited a patent licensor, a consultant, an independent engineering firm, an independent testing laboratory, a law firm, a transportation company[,] and an independent warehouse." *Alvarez*, 163 Ill. App. 3d at 716. The court then noted that Ziegler was not related to the general economic system of the product: "[It] did not make a profit from the sale of the mill, nor was it working for any party who would ultimately profit from the sale." *Alvarez*, 163 Ill. App. 3d at 716.

We find *Alvarez* inapposite to the case at bar. CS's role in this transaction is not as clear-cut as the situation that often arises in products liability cases where a sales representative profits from the sale of products it sold or facilitated the sale of on behalf of the company or companies it represented. Rather, questions of fact exist about what role CS played in the transaction, and this is exactly why a summary judgment should not be granted in this case. Unlike in *Alvarez*, CS did not merely inform CT that the truck was for sale—CS actually purchased the truck. Thus, CS was directly related to the distributive process. CS's role in the transaction was certainly more involved than many of the "independent" service companies in the examples provided in *Alvarez*, and as explained more fully below, questions of fact exist about whether CS benefited or worked for a party that would ultimately benefit from the sale.

Further, it appears that, under a plain reading of section 402A, CS would be strictly liable. Here, it is undisputed that CS sold the truck to the plaintiff's employer, CT, and that the truck reached CT without a substantial change in the condition in which it was sold. The remaining issue then is whether CS was engaged in the business of selling trucks. Comment *f* to section 402A states, in pertinent part, "[This] rule does not, however, apply to the occasional seller *** who is not engaged in that activity as a part of his business." Restatement (Second) of Torts §402A, Comment *f*, at 350 (1965).

In Clarence Brown's affidavit, he testified that CS is primarily an automobile and light truck dealer that sells and services new and used Chrysler and Dodge automobiles and trucks. He stated that CS has never maintained an inventory of car-transport trucks, had never been an authorized distributor or repair center for such trucks, and had never sold the trucks to the public. In his deposition, however, he stated that since 1933, CS had purchased and sold hundreds of these trucks to CT, that CS purchased exclusively from International, that

CS could not refuse to participate in the sale of these trucks, and that the trucks in the fleet of Auto Terminals, Inc., another Cassens family company, could have been purchased through CS and he would not have known it.

Based upon this evidence, we find there is conflicting evidence in the record about whether CS was "engaged in the business" of selling vehicle-hauler trucks. CS is not an ordinary individual, and the sale of these trucks was not an isolated transaction unrelated to the principal business of the seller. Rather, CS, an automobile dealership with a dealer's license that was required to purchase vehicle-hauler trucks, purchased and sold hundreds of these trucks to CT, which then used these trucks to deliver automobiles to CS. CT delivered automobiles on these trucks to CS at no profit, and then CS sold these automobiles. Whether CS classifies itself as a broker or as a facilitator, we find that questions of material fact exist about what CS's role was in the chain of distribution. See *Hammond*, 97 Ill. 2d at 206 (rejecting the defendant's argument that it was not a seller contemplated by section 402A where the defendant maintained that it only acted as a broker by merely facilitating and servicing its parent corporation's contracts and never had control of the product).

Furthermore, we find that material questions of fact exist about whether CS could exert pressure on International to enhance the safety of the trucks. In support of its motion for a summary judgment CS alleged that CT "did not need [CS] to complete [the] transaction" and that CS's "participation was not indispensable or mandatory, as the trailer in issue could have been purchased directly from [International] by any person or entity in Illinois." In response to CS's motion, the plaintiff attached an excerpt from the deposition testimony of Allen Cassens, vice chairman of CT and president of CS, explaining the reason CT used CS to purchase International trucks: "[A] manufacturer *** in the normal course of business cannot sell directly to a customer [because] there has to be a licensed dealer involved as an intermediary[;] okay[,] [CS] is the licensed dealer[,] and with the relationship we have, I assume that is the reason it went through [CS]." When asked if it would "be fair to say that [CT] could not have purchased those tractors directly from Navistar"[4] without CS, Allen Cassens replied, "That is my assumption." Further, the plaintiff's response included an excerpt from the deposition testimony of Clarence Brown, in which Brown stated he agreed that "trailers and tractors had to be sold to dealers" and that CS did not have the ability to stop processing the paperwork for the purchase of trucks and trailers for CT.

---

[4]Navistar International Corp. is the parent company of International.

Liberally construing the deposition testimony of Allen Cassens and Clarence Brown in favor of the plaintiff, questions of fact exist about whether CS was needed to purchase International trucks and whether CS was an indispensable and mandatory party to CT acquiring the truck or trucks. These questions are relevant to determine whether CS was in the chain of distribution for the sale of the truck and what influence CS could exert on International in purchasing these trucks. If International could not sell to CT because it was not a licensed dealer, it would seem illogical that CT could exert much influence on International. A question of fact, however, exists about what influence CS—as the necessary licensed dealer—had with International. Furthermore, a question of fact exists about whether CS was in a position to prevent the truck from entering the stream of commerce or whether CS could have adopted inspection procedures to enhance the safety of the truck, because it appears that the truck could not have been purchased without its participation.

The dissent contends that regardless of whether CS was a necessary party to the purchase of the truck, it remains true that CS could exert no influence on International where CS, *inter alia*, never selected, ordered, negotiated, or played any part in any of the aforementioned activities in regards to the purchase of these trucks. The dissent seems to ignore the fact that all that is required is that CS had the ability to or was in a position to exert influence, not that CS actually exerted any influence. See *Hammond*, 97 Ill. 2d at 206 ("Imposition of liability upon these parties is justified on the ground that their position in the marketing process enables them to exert pressure on the manufacturer to enhance the safety of the product").

We also find material questions of fact exist about whether CS profited or benefited from the sale of the truck. While CS did attach an invoice from International indicating that CS had ordered the truck at issue for CT at a price of $60,423 and did attach a notarized document from CS indicating that the same truck was later sold to CT for $60,423, other evidence attached by the plaintiff creates a question of fact about whether CS profited, either directly or indirectly, from the sale of the truck or trucks. As mentioned above, in Brown's deposition, he stated that since 1933 CT had bought hundreds of tractors and trailers through CS and that all the Cassens corporations, including CS and CT, had a policy that prohibited intercompany profit for the sales of these tractors and trailers. Raymond Abert, an officer of CS, stated in his deposition, "[T]he overall owners of the Cassens group of companies benefited by the procedure where there was no intercompany profits being made on exchanges of products."

When we liberally construe this evidence in favor of the plaintiff, a question of fact also exists about whether CS was working for a party that would ultimately profit from the sale. See *Hebel*, 92 Ill. 2d at 379 ("[S]trict liability arises[ ] not because of the defendant's legal relationship with the manufacturer or with other entities in the manufacturing-marketing system, but because of its 'participatory connection, for [its] personal profit *or other benefit*, with the injury-producing product ***' " (emphasis added)), quoting *Kasel*, 24 Cal. App. 3d at 725, 101 Cal. Rptr. at 323; *Alvarez*, 163 Ill. App. 3d at 716 (finding that the defendant was not liable in a products liability action because the defendant "was not related to the general economic system of the product" where the defendant "did not make a profit from the sale of the mill, *nor was it working for any party who would ultimately profit from the sale*" (emphasis added)).

Besides questions of fact existing about whether CS was working for a party who would ultimately benefit from the sale, we also find questions of fact exist about whether CS benefited directly by purchasing these trucks. CS's benefit could have been having its automobile inventory delivered to it at cost, rather than having to pay another vehicle-hauler company to deliver its inventory to it. Evidence in the record that CS purchased the trucks for CT, that CS sold the trucks to CT at cost, and that CT would then use the same trucks to deliver CS's inventory to it at no profit supports an inference of this. The dissent contends, "There is no evidence to support this claim despite the majority's effort to create such an inference." 398 Ill. App. 3d at 316. The dissent, however, misses the mark. Here, there was undisputed evidence in Brown's deposition that this was the procedure used by CS and CT in purchasing vehicle-hauler trucks. We believe that reasonable people could draw different inferences about whether this procedure of no-profit services between CS and CT, which ultimately resulted in providing CS with its inventory that it sold for profit, benefited CS. See *Williams*, 228 Ill. 2d at 417 ("A triable issue precluding summary judgment exists where ***, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts").

Furthermore, there are circumstances where a parent or holding company, or a "sister" subsidiary company for that matter, could be held strictly liable. See *Ogg v. City of Springfield*, 121 Ill. App. 3d 25, 32-33 (1984) ("[A] parent company which participates in the manufacture, marketing, and distribution of an unsafe product[ ] or which derives economic benefit from placing it in the stream of commerce[ ] or which is in a position to eliminate the unsafe character of the product *is liable* for the loss caused by the product" (emphasis in

original)); see also *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 290 (2007) ("Where there is evidence sufficient to prove that a parent company mandated an overall business and budgetary strategy *and* carried that strategy out by its own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary, that parent company could face liability" (emphasis in original)). Here, there was evidence that the Cassens group of companies had a policy of allowing no intercompany profits; that seven of the nine officers and directors for CS were also officers and directors for CT; that Raymond Abert and Clarence Brown were the only two officers for CS who were not officers for CT but that Clarence Brown claimed not to know who the officers or board members of CS were; that CS made its premises available to CT for creating safety videos; that Allen Cassens was the president of CS and Cassens Corp., a holding company for all of the Cassens companies, and was vice chairman of CT and Auto Terminals, Inc.; that Allen Cassens ordered CS to purchase the trucks through CS and that CS could not refuse to participate in these purchases; that Allen Cassens got involved in the negotiations with the automobile manufacturers with respect to the rates that were paid to CT; that Clarence Brown did not know why CS purchased the trucks for CT but that he did so for CS because his boss, Allen Cassens, told him to and you did what the boss said; that CT administered all the workers' compensation claims for all the Cassens companies; and that CS advertised using the same insignia as Cassens Corp. See *Forsythe*, 224 Ill. 2d at 305 (Freeman, J., specially concurring, joined by Burke, J.) ("In the matter before us, however, plaintiffs have presented sufficient evidence of conduct by defendant to create a genuine issue of material fact as to whether that conduct could not only be deemed 'eccentric under accepted norms of parental oversight' of a subsidiary's business [citation] but also 'plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent' [citation], to the extent that it could serve as a predicate for direct participant liability on the part of defendant"). We believe that genuine issues of material fact exist about whether CS should be held strictly liable for purchasing the trucks for CT, especially where it appears CS could not refuse to participate in these purchases and claims to have purchased and sold these trucks to CT for no profit.

## CONCLUSION

Because genuine issues of material fact exist about whether CS was within the distribution chain for the sale of truck of number 4533, the circuit court erred in granting a summary judgment. Accord-

ingly, the judgment of the circuit court of Madison County is reversed and the cause is remanded.

Reversed; cause remanded.

CHAPMAN, J., concurs.

JUSTICE WELCH, dissenting:

I respectfully disagree with the majority's finding that the record presents a genuine issue of material fact about whether CS was in the chain of distribution for the sale of the truck at issue. In my opinion there is no *genuine* issue of *material* fact on this question and CS is entitled to a summary judgment as a matter of law. Accordingly, I dissent.

In my opinion, the exhibits attached to CS's motion for a summary judgment are more than sufficient to meet CS's initial burden on a motion for a summary judgment. The majority posits that the invoices, which show a "sale" of the truck by CS to CT, are sufficient *alone* to create a question of material fact about whether CS participated in the chain of distribution. Perhaps *alone* they are sufficient to create a question of fact, but when viewed in conjunction with Brown's affidavit, there is no genuine issue of material fact.

The affidavit of Clarence Brown recites that Brown had been an employee of CS for nearly 60 years and vice president and general co-manager for more than 20 years. The affidavit recites that CS is primarily an automobile and light truck dealer which sells and services new and used Chrysler and Dodge automobiles and trucks. CS had never maintained an inventory of car-transport trucks and had never been an authorized distributor or repair center for those trucks. CS had never advertised any such truck for sale, nor had it ever made any representations of the quality or soundness of those trucks to any person or entity. CS had never been in the business of manufacturing or selling to the public those trucks or their seats. CS had never delivered, inspected, prepared, serviced, or taken delivery of or possession of any such truck and had never altered, modified, changed, or adjusted any such truck. CS *never received documents or paperwork* directly from the truck manufacturer regarding the purchase, sale, or lease of any such truck. Instead, that paperwork was sent by and to CT, which then forwarded the paperwork to CS. CS's only involvement with the purchase, sale, or lease of any such truck was limited to handling routine transactional tasks such as turning out the required documents for the transfer or acquisition of Illinois title, mailing or delivering those documents to appropriate recipients, handling the

transfer of funds from the trailer purchaser to the manufacturer, and assigning certificates of origin to the truck purchaser. CS never selected, ordered, or played any part in selecting or ordering models, features, or options. Those tasks were handled by CT. CS never negotiated or played any part in negotiating any conditions, terms, or provisions of the purchase of any truck. Those tasks were performed by CT. CS never determined the terms, conditions, or provisions of the sale or lease of any such truck. Those tasks were performed by CT. CS never exercised control over the design or manufacture of any such truck, nor did CS provide any instructions or warnings regarding any alleged defects in any such truck.

Although CS was reimbursed by CT for any payments made and costs incurred as a result of performing title work and other routine transactional tasks, CS had never made or derived any profits, brokerage fees, commissions, or other benefits from buying, selling, or distributing any such truck or from providing services that facilitated the buying, selling, or distributing of any such truck. CS had no control or involvement in the manufacture or design of any such truck. CS never exercised any control over any such truck and never held any state title to any such truck. CS only held certificates of origin.

The majority next finds a question of fact regarding whether CS is "engaged in the business" of selling vehicle-hauler trucks within the meaning of section 402A of the Restatement (Second) of Torts, despite Brown's affidavit to the contrary. There is no evidence in the record that CS is engaged in the business of selling vehicle-hauling trucks. There is evidence only that CS acts as a "paper shuffler" to assist CT in its purchases of such trucks, that it does this as a convenience to CT and incidentally to its business of selling cars and light trucks, and that it is not engaged in the business of selling or distributing vehicle-hauling trucks.

Again, despite Brown's uncontradicted affidavit, the majority finds a material question of fact regarding whether CS could exert pressure on the manufacturer to enhance the safety of the trucks because there was evidence that CS was a necessary and mandatory party to complete the transaction. The majority posits that this question is relevant to determine whether CS was in the chain of distribution for the sale of the truck and what influences CS could exert on the manufacturer in purchasing the truck.

I do not agree that evidence that CS might have been required to complete the purchase for CT raises a *genuine* issue of material fact about whether CS could exert influence on the manufacturer and was therefore in the distributive chain. Could CS have volunteered to do so? Perhaps, but it did not because it was not in the business of selling

vehicle-hauling trucks. CS merely acted as a "go-between" or facilitator between CT and the manufacturer. Regardless of whether CS was a necessary party to the purchase of the truck, it remains true that CS could exert no influence on the manufacturer where CS never selected, ordered, or played any part in selecting or ordering models, features, or options, never negotiated or played any part in negotiating any conditions, terms, or provisions of the purchase of any truck, never selected, ordered, or played any part in selecting or ordering models, features, or options, never negotiated or played any part in negotiating any conditions, terms, or provisions of the purchase of any truck, never determined the terms, conditions, or provisions of the sale or lease of any such truck, never exercised control over the design or manufacture of any such truck, never provided any instructions or warnings regarding any alleged defects in any such truck, and never had control or involvement in the manufacture or design of any such truck.

The majority also finds that there exists a genuine question of fact about whether CS profited or benefited from the sale of the truck or was working for a party that would ultimately profit from the sale. There is no evidence in the record of any profit being made by CS on the sale of the truck. The majority states, "CS's benefit could have been having its automobile inventory delivered to it at cost, rather than having to pay another vehicle-hauler company to deliver its inventory to it." 398 Ill. App. 3d at 312. There is no evidence to support this claim despite the majority's effort to create such an inference.

The only evidence pertaining to profit in the record is that stockholders of a holding company which owned CS and CT profited more if there were no "intercompany profits being made on exchanges of products." The majority asserts that this creates a question of fact about whether CS was "working for a party that would ultimately profit from the sale." 398 Ill. App. 3d at 312. But any benefit or profit inuring to the holding company would not be the result of the "sale" of the truck by CS to CT, but a result of the lack of "intercompany profits being made on exchanges of products." This is not the kind of profit which is evidence that CS is in the distributive chain. Nor is it the kind of profit contemplated by *Alvarez v. Koby Machinery Co.*, 163 Ill. App. 3d 711, 716 (1987), the case cited by the majority, which referred to the liability of a sales representative working for a party that would ultimately profit from the sale. There is no evidence that CS was acting as a sales representative for the holding company or any other entity. There is no evidence that CS made any profit on the sale of the truck. Accordingly, I would find that there is no *genuine* is-

sue of fact about whether CS profited, either directly or indirectly, from the sale of the truck and was therefore in the distributive chain.

Finally, I would find that CS was entitled to a judgment as a matter of law. In *Hammond v. North American Asbestos Corp.*, 97 Ill. 2d 195, 206 (1983), the supreme court held, "In a products liability action, all persons in the distributive chain are liable for injuries resulting from a defective product, including suppliers, distributors, wholesalers[,] and retailers." The court held that the imposition of liability upon these parties is justified on the ground that their position in the marketing process enables them to exert pressure on the manufacturer to enhance the safety of the product. *Hammond*, 97 Ill. 2d at 206.

In *Bittler v. White & Co.*, 203 Ill. App. 3d 26, 29-30 (1990), it was held, "Even parties who are not within the actual chain of distribution, but who play an integral role in the marketing enterprise of an allegedly defective product and participate in the profits derived from placing the product into the stream of commerce, are held liable under the doctrine of strict liability." *Bittler* pointed out that one of the public policy rationales which justifies imposing strict liability on manufacturers, as well as sellers, suppliers, wholesalers, distributors, and even lessors, is based on the fact that these entities, as parts of the chain of distribution, are involved in and reap a profit from the placement of the allegedly defective product into the stream of commerce. 203 Ill. App. 3d at 29. *Bittler* held that the imposition of strict liability hinges on whether the party in question has any participatory connection for its personal profit or other benefit with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product. 203 Ill. App. 3d at 30.

In *Alvarez*, 163 Ill. App. 3d at 714, the court held that one of the underlying reasons for imposing strict liability is to ensure that losses are borne by those who created the risk and subsequently reaped a profit from marketing an allegedly defective product.

In *Hammond*, the defendant from whom the plaintiff sought to recover in strict liability was a wholly owned subsidiary of the manufacturer of the defective product, asbestos. Its annual reports to the Secretary of State listed its business as the manufacture and sale of asbestos. The defendant had been incorporated to be a contact point in North America for the manufacturer's customers, and while making only a few direct sales of asbestos, it primarily functioned as a message relay center between the manufacturer and its customers. The defendant received a 2¹/₂% commission on all sales in North America. The defendant never had physical possession of any asbestos sold by the manufacturer.

On appeal from a jury verdict for the plaintiff, the defendant argued that it was not a seller but that it acted merely as a broker by merely facilitating and servicing its parent corporation's contracts for the sale of asbestos. The supreme court concluded that the jury could have concluded that the defendant's role in marketing the asbestos was sufficient to support strict liability. *Hammond*, 97 Ill. 2d at 206.

In *Bittler*, the plaintiffs appealed from a summary judgment in favor of the defendant on their strict liability claim. The defendant was the exclusive sales representative in its territory for the manufacturer of an Ultravac machine. The defendant moved for a summary judgment on the ground that it was not in the "chain of distribution" for the product because it did not design, manufacture, or gain possession of the product.

The appellate court reversed the grant of a summary judgment, rejecting the defendant's argument that it merely acted as a liaison between the manufacturer and the purchaser and that its role in the sales transaction was tangential, placing it outside the chain of distribution. The appellate court found that the defendant was bound by its exclusive sales representative contract to promote the sale of the products and, through this relationship, derived an economic benefit in the form of a commission on all the sales made within its territory. Accordingly, the court held that the defendant's "participatory connection" with the allegedly defective product was sufficient to make it subject to strict liability. *Bittler*, 203 Ill. App. 3d at 30.

However, in *Alvarez*, 163 Ill. App. 3d at 714-16, the appellate court affirmed a summary judgment in favor of the defendant because it did not make a profit from the sale of the allegedly defective machine, was not working as a sales representative for any party that would ultimately profit from the sale, and did not supply or have any connection with the defective machinery.

In that case, the defendant simply told a prospective purchaser about a piece of used machinery that was for sale by another company, and the defendant inspected the gearbox of the machine for the prospective purchaser. The defendant received no compensation for inspecting the gearbox, although the prospective purchaser did pay its expenses. The defendant did not make any recommendations for modification of the machine and did not participate in the negotiations for the sale, and the entire transaction took place between the purchaser and the seller. The defendant received no compensation in connection with the sale. The defendant did not participate in the design of or in fact design, prepare, manufacture, advertise, or offer to sell the machine in question or act as a manufacturer's representative for the machine in question. Accordingly, the court found that the

defendant's conduct could not be characterized as placing the machine into the chain of distribution, and thus the defendant could not be held strictly liable for any defect in the product. *Alvarez*, 163 Ill. App. 3d at 713-14.

In *Rivera v. Mahogony Corp.*, 145 Ill. App. 3d 213 (1986), the circuit court entered a summary judgment in favor of the defendant in the plaintiff's products liability action. The circuit court found that the defendant was a "financial" lessor and consequently not in the distributive chain of the product. The court ruled that the lease was primarily a financial transaction where money was provided by one who was not in the business of selling or placing products into the stream of commerce to a lessee, who was a borrower, to enable him to purchase the product. *Rivera*, 145 Ill. App. 3d at 214. The appellate court affirmed.

In that case, the evidence showed that the defendant was in the business of financing the acquisition of equipment by entering into arrangements with its customers which were styled as leases. The defendant was not in the business of selling the type of machine purchased, nor did it have any knowledge or experience concerning the manufacture, sale, or distribution of those machines. The injured plaintiff's employer selected the particular machine and obtained both a price quotation and an offer of sale from the manufacturer. The purchase was financed through an arrangement with the defendant whereby the defendant purchased the machine and leased it to the plaintiff's employer, who also had an option to purchase the machine when the lease expired. The machine was shipped directly to the plaintiff's employer, and the defendant never had possession or control of it. At the end of the lease term, the plaintiff's employer exercised its option to purchase the machine. *Rivera*, 145 Ill. App. 3d at 214-15.

The appellate court distinguished "commercial" lessors, who are in the business of leasing equipment and have been held to be in the original chain of distribution because they reap a profit from placing the product into the stream of commerce (see *Crowe v. Public Building Comm'n*, 74 Ill. 2d 10, 15 (1978)), from "financial" lessors such as the defendant in the case before it. *Rivera*, 145 Ill. App. 3d at 215-16. The court held that in the case of a "financial" lessor, the public policy considerations supporting the imposition of strict liability would not be furthered by subjecting the lessor to strict liability. *Rivera*, 145 Ill. App. 3d at 217. The defendant was in no position to exert pressure on the manufacturer to enhance the safety of the product, nor did the defendant take any part in the marketing or production of the product. *Rivera*, 145 Ill. App. 3d at 217-18. Finally, any profit the defendant reaped derived from having placed its money, and not the defective

product, into the stream of commerce. *Rivera*, 145 Ill. App. 3d at 218. Accordingly, the appellate court affirmed the circuit court's conclusion that the defendant was not strictly liable in tort.

I find the facts of the case at bar to be more similar to those of *Alvarez* and *Rivera* than to those of *Hammond* and *Bittler*. Unlike the defendants in *Hammond* and *Bittler*, the defendant in the case at bar reaped no profit from the sale and distribution of the car-transport truck. In my opinion, the evidence is undisputed that although CS was reimbursed for its expenses in performing services for CT, it did not make any profit off the sale of the car-transport truck to CT.

Unlike the defendants in *Hammond* and *Bittler*, who were authorized sales agents for the manufacturers, the defendant in the case at bar, who neither represented the manufacturer nor had any role in ordering the truck in question, had no ability to exert pressure on the manufacturer to enhance the safety of the product. The defendant in the case at bar had no input into the production or marketing of the car-transport truck. The evidence is undisputed that CS did not play any part in selecting or ordering the truck or any of its features or options. CS never corresponded directly with the manufacturer regarding the sale and purchase of the truck; all that correspondence was conducted by CT.

Further, unlike the defendants in *Hammond* and *Bittler*, the defendant in the case at bar was not involved in promoting, marketing, or creating consumer demand for the allegedly defective product. As sales representatives for the manufacturers, the defendants in *Hammond* and *Bittler* played an integral role in the marketing enterprise that created consumer demand for the allegedly defective products.

The facts of the case at bar are similar to those in *Alvarez* and *Rivera*. Like the defendants in *Alvarez* and *Rivera*, the defendant did not play any role in promoting, marketing, or creating consumer demand for the allegedly defective product.

Like the defendant in *Alvarez*, the defendant in the case at bar did not make a profit from the sale of the car-transport truck and did not work as a sales representative for any party who ultimately profited from the sale. The defendant did not participate in the negotiations for the sale, and the entire transaction took place between the purchaser and the seller. The defendant did not participate in the design of or in fact design, prepare, manufacture, advertise, or offer to sell the truck in question or act as the manufacturer's representative for the truck in question.

Like the defendant in *Rivera*, the defendant in the case at bar was not in the business of selling the car-transport trucks, nor did it have

any knowledge or experience concerning the manufacture, sale, or distribution of those trucks. The truck was delivered directly to CT, and CS never took possession or control of the truck in question.

Because CS is not in the chain of distribution, the public policy reasons for imposing strict liability in tort—the ability to exert pressure on the manufacturer to enhance the safety of the product and the reaping of a profit from the placement of the allegedly defective product into the stream of commerce—simply do not apply in the case at bar. Because I believe there is no genuine question of material fact and that CS is entitled to a judgment as a matter of law, I would have affirmed the summary judgment in favor of the defendant.