# Illinois Official Reports

## Appellate Court

---

### *Ciolino v. Simon*, 2020 IL App (1st) 190181

---

| | |
|---|---|
| Appellate Court Caption | PAUL J. CIOLINO, Plaintiff-Appellant, v. ALSTORY SIMON, JAMES DeLORTO, TERRY A. EKL, JAMES G. SOTOS, MARTIN PREIB, WILLIAM B. CRAWFORD, ANITA ALVAREZ, ANDREW HALE, and WHOLE TRUTH FILMS, LLC, Defendants-Appellees. |
| District & No. | First District, First Division<br>No. 1-19-0181 |
| Filed | March 16, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-L-0044; the Hon. Christopher E. Lawler, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, and remanded. |
| Counsel on Appeal | Jennifer Bonjean, of Bonjean Law Group, PLLC, of Brooklyn, New York, for appellant.<br><br>Phillip J. Zisook, of Schoenberg, Finkel, Newman & Rosenberg, LLC, of Chicago, for appellee Alstory Simon.<br><br>Steven B. Borkan, Timothy P. Scahill, Graham P. Miller, and Krista E. Stalf, of Borkan & Scahill, Ltd., of Chicago, for appellee James DeLorto. |

Jeremy N. Boeder and Harlene Gluck Matyas, of Tribler, Orpett & Meyer P.C., of Chicago, for appellee Terry A. Ekl.

Michael L. Resis and Ryan B. Jacobson, of SmithAmundsen, LLC, of Chicago, for appellee James G. Sotos.

James E. Thompson, Robert R. Arroyo, and Timothy M. Grace, of Gottreich Grace & Thompson, of Chicago, for appellee Martin Preib.

Perry W. Hoag and Mel Zhang, of Cameli & Hoag, P.C., of Chicago, for appellee William B. Crawford.

Eileen E. Rosen and Andrew J. Grill, of Rock, Fusco & Connelly, LLC, of Chicago, for appellee Anita Alvarez.

Steven P. Mandell, Keith E. Allen, and Brian D. Saucier, of Mandell Menkes LLC, of Chicago, for other appellees.

| Panel | PRESIDING JUSTICE GRIFFIN delivered the judgment of the court, with opinion.<br>Justices Pierce and Walker concurred in the judgment and opinion. |

## OPINION

¶ 1 This case stems from one of the most famous murder cases in the recent history of our state. The background of the case is gripping. It is no real surprise then that the events surrounding the case have spurred a movie, a book, and other media attention. But that media attention is the reason the parties are before the court today.

¶ 2 Plaintiff Paul Ciolino is suing several defendants for defamation and other causes of action for the statements they made about his alleged involvement in framing a supposedly innocent man for murder. The allegedly defamatory statements attributed to defendants are found in a book and the movie it inspired. Despite that the case reads like a movie script, there has been no fairy-tale ending for anyone involved.

¶ 3 The subject of the appeal is a bit less engrossing than the overall subject matter of the case. Here we are called to decide whether Ciolino's claims arising from the publication of the allegedly defamatory statements are barred by the statute of limitations. We hold that the claims against one defendant are time barred but that the remainder of the claims are not. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

I. BACKGROUND

¶ 5 In 1982, Jerry Hillard and Marilyn Green were murdered in Washington Park in Chicago. Anthony Porter was convicted for the murders and was sentenced to the death penalty. Professor David Protess and other members of Northwestern University's Innocence Project took an interest in the case. Members of the Innocence Project reviewed evidence gathered by Porter's defense attorney during the case, and they identified that another man, defendant Alstory Simon, was in the area of the murders close to the time that they were committed. The Innocence Project began to collect and evaluate evidence and, at some point, came to believe that Simon committed the murders, not Porter.

¶ 6 Plaintiff Paul Ciolino was employed as a private investigator and did work for the Innocence Project. Ciolino and another Innocence Project investigator traveled to Milwaukee to meet with Simon. Simon claims that Ciolino arrived at his home in Milwaukee, claiming to be a police officer from Illinois. Ciolino was armed with a handgun. He allegedly informed Simon that his team had developed evidence that pointed to Simon as the guilty party in the Washington Park murders. Simon was a drug addict, and he maintains that he was intoxicated at the time of Ciolino's visit.

¶ 7 Ciolino allegedly told Simon that he had secured sworn statements from Simon's ex-wife Inez Jackson and from others in which they averred that Simon committed the murders. Ciolino showed Simon the statements. Ciolino also showed Simon a video that the Innocence Project had made using a paid actor. The actor in the video stated that he was an eyewitness to the murders and that he saw Simon kill Hillard and Green. Simon also viewed video of a news report in which his ex-wife, Inez Jackson, claimed that she was with Simon when he committed the murders in Washington Park. Simon maintains that Ciolino promised him that he would receive only a short prison sentence if he confessed and that he would receive large sums of money from book and movie deals because of the intense publicity of the case.

¶ 8 As the meeting progressed, Ciolino allegedly informed Simon that he and his colleague were not actually police officers but that they were members of the Innocence Project. Simon claims that Ciolino then told him that Ciolino and Protess would secure a lawyer to represent him in the murder case and that they would do whatever else was necessary to ensure that he would receive no more than a couple years in jail if he confessed. Ciolino then allegedly informed Simon that the police were imminently on their way from Chicago to arrest him and that they were trying to help him, but that the only way Simon could avoid the death penalty was to provide a videotaped confession before the police arrived. Ciolino allegedly told Simon that confessing at that moment was his one and only chance to help himself. Simon provided a videotaped confession.

¶ 9 Armed with Simon's videotaped confession and the statements from Simon's ex-wife and her nephew, Walter Jackson, the Innocence Project undertook to free Porter from prison. After a petition was filed and the proceedings progressed, Porter's conviction was vacated. The Cook County State's Attorney simultaneously empaneled a grand jury that indicted Simon for the murders.

¶ 10 Ciolino allegedly followed through on his promise to secure an attorney to represent Simon. Simon, in fact, retained attorney Jack Rimland to represent him in the murder case. Jack Rimland was an attorney in Chicago that shared office space with Ciolino. Rimland purportedly convinced Simon to plead guilty by telling Simon that he needed to make the deal in order to avoid the death penalty or life in prison. Rimland, on Simon's behalf, did not

challenge the confession that Simon gave to Ciolino, nor did he present any other evidence to the court, including the evidence that implicated Porter in the first place and led to his conviction.

¶ 11 Simon further claims that Rimland told him to apologize to the victims' families in order to make his confession seem legitimate. During the time Rimland was representing Simon, Rimland maintained contact with his officemate Ciolino. For example, Rimland presented an award to Ciolino and other Innocence Project members for the work they did to overturn Porter's conviction even though he was concurrently representing Simon in a case for the same murders.

¶ 12 Simon eventually did plead guilty to the murders. He was sentenced to 37 years in prison. At his sentencing hearing, Simon apologized to the victims' families. Simon continued to claim responsibility for the murders in a televised news interview after his guilty plea. Simon also wrote letters to several individuals, including to Anthony Porter, apologizing for committing the murders. Nonetheless, many people did not believe that Simon was responsible for the crimes. Another private investigator, defendant James DeLorto, who did not believe Simon's confession and was skeptical of the Innocence Project's involvement, independently began to investigate Simon's case for the potential that he was innocent of the crimes.

¶ 13 Not surprisingly, the case generated significant publicity, including publicity generated by Ciolino and other members of the Innocence Project giving interviews and making statements to the press. Anthony Porter's exoneration for the Washington Park murders led to Governor George Ryan calling for a moratorium on the death penalty in Illinois.

¶ 14 Ciolino was interviewed on television following Simon's conviction. Ciolino described the tactics he used in securing Simon's confession. Ciolino acknowledged that he used a paid actor to make a video who identified Simon as the shooter. Ciolino stated that, after Simon was confronted with the video and other evidence, Simon just "gave up." Ciolino stated that he and his partner "just bull rushed [Simon] and mentally he couldn't recover." Ciolino stated that, as a private investigator, "I don't have any rules. The Supreme Court says I can lie, cheat, do anything I want, to get him to say what I want him to say." Also in that vein, Protess published a book in which he explained how, on another occasion, Ciolino posed as Hollywood producer Jerry Bruckheimer and offered a witness a movie deal in exchange for the witness to change testimony he had previously given.

¶ 15 Simon filed a *pro se* petition for postconviction relief claiming that his confession to Ciolino was involuntary and that he received ineffective assistance of counsel from Rimland. The court denied Simon's *pro se* petition.

¶ 16 Subsequently, defendants Terry Ekl and James Sotos undertook to represent Simon, and they filed a successive postconviction petition on his behalf. In his successive petition, Simon asserted an actual innocence claim and provided new evidence. The new evidence that Simon provided in support of his petition was that two of the witnesses that had implicated Simon in the murders, his ex-wife Inez Jackson and her nephew Walter Jackson, recanted their statements.

¶ 17 Inez Jackson and Walter Jackson explained that they had implicated Simon based on promises from David Protess of the Innocence Project. Inez Jackson reportedly had serious drug and alcohol problems and was allegedly given food, cash, alcohol, and other things of value by Protess and his team. In an affidavit, Walter Jackson admitted that he provided false evidence against Simon for money and for help with his own legal problems and that he

- 4 -

encouraged Inez Jackson, his aunt, to also provide false testimony in order to help with his legal troubles. It was additionally brought to light for the first time in Simon's successive postconviction proceedings that Inez Jackson had provided a statement to the police when they were originally investigating the murders in which she stated that she was with Simon the night of the murders and that he did not commit them.

¶ 18    Some concerns were raised about the Innocence Project's conduct in this case and in other cases. After Northwestern University conducted a court-ordered internal investigation into the controversial journalistic and investigative practices of the Innocence Project under Protess, he was separated from the university. Once the controversial practices of the Innocence Project were revealed, defendant Anita Alvarez, the Cook County State's Attorney, agreed to revisit Simon's case. After a yearlong investigation in which more than 100 witnesses were interviewed, the state's attorney's office concluded that, in light of the unlawful investigative conduct by Ciolino and Protess and the inadequate representation that Simon received, the case was so tainted and the convictions so called into doubt that Simon's convictions could not stand. The state's attorney's office moved to formally abandon all charges against Simon, and the circuit court granted the motion and vacated Simon's convictions. Simon was released from prison after serving 15 years.

¶ 19    At a news conference announcing the decision to drop the charges against Simon, Alvarez, as State's Attorney, stated that the "investigation by David Protess and his team involved a series of alarming tactics that were not only coercive and absolutely unacceptable by law enforcement standards, they were potentially in violation of Mr. Simon's constitutionally protected rights." Alvarez continued, expressing that, in her view, "the original confession, made by Alstory Simon and the coercive tactics that were employed by investigator Ciolino have tainted this case from the outset and brought into doubt the credibility of many important factors." She concluded that "[t]he bottom line is that the investigation conducted by Protess and private investigator Ciolino, as well as the subsequent legal representation of Mr. Simon, were so flawed that it is clear that the constitutional rights of Mr. Simon were not scrupulously protected as our law requires. This conviction therefore cannot stand."

¶ 20    Thereafter, Simon sought a certificate of innocence. The circuit court denied Simon's petition for a certificate of innocence under the statute governing such proceedings because the statute requires the petitioner to prove, among other things, that the petitioner did not, by his own conduct, voluntarily bring about his conviction. See 735 ILCS 5/2-702(g)(4) (West 2016). The circuit court found that Simon had, in fact, brought about his own conviction by confessing and by pleading guilty. However, the circuit court went further, finding that Simon "had certainly satisfied his burden" of demonstrating his innocence by a preponderance of the evidence.

¶ 21    In explaining its finding that Simon had demonstrated his innocence, the circuit court stated that it accepted Simon's allegation that he had gone along with Protess and Ciolino's plan to free Porter and to frame himself. The circuit court further accepted that Simon had done so based upon Ciolino's promises that he would receive a short prison sentence and would receive large sums of money when he was freed from prison with Protess's assistance. The circuit court credited Simon's allegations that Ciolino had impersonated a police officer, that Simon was threatened with the death penalty if he did not confess, and that Ciolino promised Simon money from book and movie deals and a short prison sentence if he confessed. In conclusion,

the court noted, "it is more likely true than not that [Simon] is actually innocent of the murders of Hillard and Green."

¶ 22　　On February 17, 2015, Simon filed a federal civil rights lawsuit for malicious prosecution against Ciolino, Northwestern University, David Protess, and Jack Rimland. In his suit, Simon sought damages for the parties' respective roles in his allegedly wrongful conviction. The allegations made in Simon's federal suit are consistent with those set forth above.

¶ 23　　About three years before Simon was released from prison, in the spring of 2011, defendant William Crawford wrote a document he titled "Chimera" that set forth his narrative that Simon was framed by the Innocence Project. "Chimera" was not officially published, but Crawford claims that he uploaded a copy of it to the Internet. Then, while Simon's federal case against the Innocence Project parties was ongoing, on June 9, 2015, Crawford published a book titled *Justice Perverted: How the Innocence Project of Northwestern University's Medill School of Journalism Sent an Innocent Man to Prison* (hereinafter *Justice Perverted*). *Justice Perverted* has the same subject matter and has many verbatim passages from "Chimera." The book makes the case that Ciolino, Protess, and others framed Simon for the Washington Park murders in order to secure the release of Porter, who was on death row. The book further makes the case that the Innocence Project had a more Machiavellian motive for securing Porter's release: to put an end to the death penalty in Illinois.

¶ 24　　Crawford's book, *Justice Perverted*, inspired a documentary film made by defendants Andrew Hale and Whole Truth Films titled "A Murder in the Park." The documentary features interviews and commentary from defendants Simon, Hale, Ekl, Sotos, DeLorto, Crawford, and Alvarez. The documentary has the same theme as *Justice Perverted*, and the film's subjects claim that Ciolino engaged in a variety of crimes to secure a false confession from Simon. Both the book and the film track closely to the allegations made by Simon in his postconviction proceedings, some of which have been found credible in the courts and some of which have been admitted by Ciolino. The film's thesis is that Protess and the Innocence Project wanted to end the death penalty in Illinois and that they were willing to use any means to accomplish that objective—including framing an innocent man for murder.

¶ 25　　Ciolino has his own theory about the motives behind the individuals on the other side of the dispute. Ciolino contends that the whole effort to free Simon was an undertaking aimed at discrediting the Innocence Project and the wider wrongful conviction movement as a whole. The narrative Ciolino advances begins with defendant DeLorto. DeLorto has a law enforcement background and has made negative statements about the work of Protess in the past. During the course of his work as a private investigator, DeLorto worked with attorneys Ekl and Sotos. Ciolino maintains that Ekl and Sotos undertook to represent Simon, with DeLorto as their investigator, "with any eye toward using the case to discredit the Porter exoneration and smear David Protess and Northwestern University."

¶ 26　　Ciolino contends that defendant Crawford became involved with DeLorto and with Simon's lawyers, Ekl and Sotos, and wrote *Justice Perverted* to disseminate their false narrative that Simon was framed by the Innocence Project. Ciolino further contends that DeLorto and his cohorts enlisted defendant Martin Preib to help them combat the wrongful conviction movement. Preib began to author a blog titled "Crooked City: The Blog About the Wrongful Conviction Movement." Ciolino claims that Preib used the blog to circulate false and misleading narratives about exonerations, including the Porter exoneration. It is Ciolino's

position that Crawford's book, Hale's documentary, and Preib's blog were all conceived as part of a conspiracy to disrupt the "innocence industry."

¶ 27    Similarly, Ciolino contends that Anita Alvarez dismissed the charges against Simon because she harbored resentment toward Protess and the Innocence Project because of her supposed pro-law-enforcement leanings and because Protess had been critical of her in the past. Ciolino opines that Alvarez had been nationally embarrassed in another case in which Northwestern University was involved and that Alvarez had become dead set on doing anything she could to discredit Protess. Ciolino goes as far as to say that Alvarez "release[d] a murderer to settle a score."

¶ 28    Defendants Hale and Whole Truth Film's documentary "A Murder in the Park" premiered on November 17, 2014, at DOC NYC in New York. DOC NYC bills itself as "America's largest documentary film festival." Several defendants in this case attended the film's premiere, and around this time, several publications of varying renown wrote about the film's premiere or the film's existence. "A Murder in the Park" was also shown at the Cleveland International Film Festival, which took place from March 24 to 26 in 2015.

¶ 29    On April 27, 2016, Ciolino filed a counterclaim in Simon's federal case. Ciolino countersued Simon, and he interposed claims against Alvarez, Hale, Ekl, Sotos, DeLorto, Preib, Crawford, and Whole Truth Films. Ciolino sought damages against the defendants therein for defamation, false light, intentional infliction of emotional distress, and conspiracy. Ciolino's claims stemmed from the statements those defendants made in "A Murder in the Park" and *Justice Perverted*. Ciolino contends that those publications advance "an outrageous and demonstrably false claim" that Protess and Ciolino framed Simon, an innocent man, "so that death row inmate Anthony Porter could become a 'poster boy' for the bid to end executions in Illinois."

¶ 30    The federal district court dismissed Ciolino's counterclaim on January 3, 2017. The district court found that Ciolino's counterclaim was not a compulsory counterclaim under the Federal Rules of Civil Procedure (see Fed. R. Civ. P. 13(a)) and that the court did not have supplemental jurisdiction over the counterclaim because the "counterclaim [did] not arise out of the same transaction or occurrence as Simon's malicious prosecution claim." *Simon v. Northwestern University*, No. 15-CV-1433, 2017 WL 25173, at *5 (N.D. Ill. Jan. 3, 2017). The court noted that, even if it could exercise supplemental jurisdiction over the counterclaim, it would decline to do so. *Id.*

¶ 31    Subsequently, Simon reached a settlement for his malicious prosecution claim with Northwestern University and Protess. Simon then voluntarily dismissed Ciolino as a defendant.

¶ 32    A day less than a year after Ciolino's counterclaim in Simon's federal case was dismissed, on January 2, 2018, Ciolino filed this case. Ciolino raises the same claims against the same parties in this case as he did in his counterclaim in federal court. This case is, in substance, a refiling of the counterclaim that was dismissed for lack of jurisdiction in federal court.

¶ 33    In this case, count I of Ciolino's complaint is for defamation against all defendants except for Preib. That count is really based upon all of the content and statements contained in "A Murder in the Park." Count II is for defamation against Crawford only. That count is based upon Crawford's book *Justice Perverted* and the statements he makes therein. Count III is for defamation against Preib only. That count is based upon the statements Preib made on his blog "Crooked City." Count IV is for false light publicity against all defendants. Count V is for

intentional infliction of emotional distress against all defendants. And count VI is for civil conspiracy and seemingly alleges the involvement of all defendants.

¶ 34     Defendants all moved to dismiss the respective claims against them. The trial court granted all the motions to dismiss, finding that the claims asserted by Ciolino are time barred. Ciolino filed this appeal.

¶ 35                                     II. ANALYSIS

¶ 36     The circuit court granted all defendants' motions to dismiss on the basis that the claims Ciolino filed against them are barred by the statute of limitations. Defendants all brought their motions to dismiss, at least in part, under section 2-619 of the Code of Civil Procedure, which provides for the involuntary dismissal of a claim based upon certain defects or defenses. See 735 ILCS 5/2-619 (West 2016).

¶ 37     A section 2-619 motion to dismiss admits the legal sufficiency of the complaint. See *id.* The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proved issues of fact at the outset of the litigation. *Jones v. Brown-Marino*, 2017 IL App (1st) 152852, ¶ 20. Although a section 2-619 motion to dismiss admits the legal sufficiency of a complaint, it raises defects, defenses, or some other affirmative matter appearing on the face of the complaint or established by external submissions that defeat the plaintiff's claim. *Ball v. County of Cook*, 385 Ill. App. 3d 103, 107 (2008). The failure to file a claim within an applicable statute of limitations is one of the proper bases for dismissal under section 2-619. See 735 ILCS 5/2-619(a)(5) (West 2016). We review the trial court's decision to grant a motion to dismiss *de novo*. *In re Marriage of Wojcik*, 2018 IL App (1st) 170625, ¶ 17.

¶ 38     To begin, it is helpful to set forth the relevant dates that provide a roadmap for this appeal—providing the ultimate criteria for determining whether the claims are time barred. The first relevant date for purposes of the defamation case is Crawford's completion of "Chimera." That document was completed in spring 2011. "A Murder in the Park," the documentary film at issue in the case, premiered to an audience for the first time in New York on November 17, 2014. *Justice Perverted* was published June 9, 2015. The relevant blog posts allegedly written by Preib were posted between June 2015 and April 2016. Ciolino's federal court counterclaim was filed April 27, 2016, and dismissed on January 3, 2017. And Ciolino's complaint in this case was filed January 2, 2018.

¶ 39     We note here that the operative filing date for Ciolino's claims in this case is April 27, 2016. The reason that date is the operative date is because the Illinois savings statute is applicable. The Illinois savings statute states that, where an action is dismissed by a United States District Court for lack of jurisdiction, then, regardless of whether the statute of limitations has run during the pendency of the action, the plaintiff may commence a new action in state court within one year of the dismissal or within the remaining period of limitation, whichever is greater. 735 ILCS 5/13-217 (West 2016); see also *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 105-06 (1996). Ciolino timely refiled his claims in state court within one year of the claims being dismissed for lack of jurisdiction in federal court. So the question before us now is whether the claims were timely filed when Ciolino filed them in federal court on April 27, 2016.

¶ 40     The main issue before us is whether defendants are entitled to dismissal on the basis that "A Murder in the Park" premiered more than a year before Ciolino filed his claims in federal court. For purposes of logical flow, however, we begin with Ciolino's claims against Crawford

for his publication of *Justice Perverted*. We will then address the primary issue on appeal—whether the defamation claims accrued when "A Murder in the Park" premiered or at any time thereafter but more than a year before Ciolino filed suit. Then, because the claims against Alvarez require an analysis separate from that required for the claims against the other defendants, we will turn to the claims against her which relate to comments she made in a news conference that were re-aired in "A Murder in the Park." We will then address defendant Preib's arguments and all of the other defendants' alternative arguments regarding why we should affirm. Finally, we will move to the propriety of the trial court's dismissal of Ciolino's claims for intentional infliction of emotional distress and conspiracy.

¶ 41                          A. Defamation and False Light

¶ 42    Ciolino's principal claims are for defamation and false light publicity. In Illinois, the statute of limitations for a claim for defamation is one year from the point that the cause of action accrued. 735 ILCS 5/13-201 (West 2016); *Moore v. People for the Ethical Treatment of Animals, Inc.*, 402 Ill. App. 3d 62, 73 (2010). Generally, in defamation cases, the cause of action accrues, and the statute of limitation begins to run, on the date the allegedly defamatory statement is published. *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 61 Ill. 2d 129, 131-32 (1975). Similarly, an action for false light publicity has a one-year statute of limitations. 735 ILCS 5/13-201 (West 2016); *Ludlow v. Northwestern University*, 79 F. Supp. 3d 824, 841 (N.D. Ill. 2015). False light publicity claims accrue when the statements are made. 735 ILCS 5/13-201 (West 2016).

¶ 43                          1. Crawford—*Justice Perverted*

¶ 44    "Chimera," its full title apparently being "Chimera—A Story Based on the Public Record," was written and completed by William Crawford in spring 2011. Subsequently, Crawford wrote a full-length book on the subject titled *Justice Perverted: How the Innocence Project at Northwestern University's Medill School of Journalism Sent an Innocent Man to Prison*, which was published on June 9, 2015. Crawford maintains that most of the statements in *Justice Perverted* that Ciolino alleges to be defamatory are verbatim statements from "Chimera" and that only minor alterations have been made to those statements that are not exact reproductions. Thus, Crawford argues, spring 2011 should be the point at which Ciolino's claims accrued for defamation based on the allegedly defamatory statements in *Justice Perverted* because that is the point at which the statements were published in "Chimera."

¶ 45    For defamation claims, Illinois applies the "single publication rule." The single publication rule is that "[n]o person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance." 740 ILCS 165/1 (West 2016). Under this rule, defamation and privacy actions are complete at the time of the first publication, and any subsequent appearances or distributions of copies of the original publication are of no consequence to the creation or existence of a cause of action. *Blair v. Nevada Landing Partnership RBG, LP*, 369 Ill. App. 3d 318, 324-25 (2006).

¶ 46    Crawford points out that Ciolino's own allegations in this case reveal that Crawford "circulated ['Chimera'] to virtually every media outlet in the city." Crawford suggests that the statements that Ciolino alleges to be defamatory were, thus, published to those news outlets when Crawford was trying to have his story printed. We have held that any act by which a

defamatory matter is communicated to someone other than the person defamed is a "publication." *Missner v. Clifford*, 393 Ill. App. 3d 751, 763 (2009) (citing Restatement (Second) of Torts § 577 cmt. a, at 201-02 (1977)). On this basis, Crawford posits that the statements were "published" to those to whom he circulated "Chimera" with the purpose of trying to obtain a wider circulation.

¶ 47 We reject Crawford's assertion that the statements in "Chimera" were, as a matter of law, published when he allegedly shopped his story to media outlets in the city. There is no evidence that anyone at those news outlets even read "Chimera," let alone that they read the specific statements that Ciolino now claims are defamatory. Whether a publication has occurred at all is a question for the jury. *Id.* (citing Restatement (Second) of Torts § 617 cmt. a, at 315 (1977)). The only support for Crawford's position that "Chimera" was seen by anyone other than him is Ciolino's allegation that Crawford attempted to have the story disseminated by media outlets in the city. There is no evidentiary support from Crawford, including even an affidavit from him, to support a finding that he published "Chimera" or any individual statement therein to anyone.

¶ 48 The single publication rule simply does not apply here. The supposed republication in this case is not really a republication at all; it was the statements' actual publication. Because there is a question regarding whether "Chimera" and the statements therein were ever "published," the allegedly defamatory statements in *Justice Perverted* cannot be deemed to be re-airings of any previously published defamatory statements such that they might benefit from the single publication rule. Crawford even acknowledges, as he must, the many differences between "Chimera" and *Justice Perverted*. *Justice Perverted* is far from a mere republication of "Chimera"; it is a new, independent work. As far as the record in this case is currently constructed, there has only been one publication of the allegedly defamatory statements in *Justice Perverted*, and that publication occurred when *Justice Perverted* was published.

¶ 49 Crawford also states that he "placed [Chimera] on the internet" in 2011 when he completed it. He argues that by putting "Chimera" on the Internet in 2011 he published the statements therein such that the statute of limitations for any claims related to those statements should have begun to run in 2011. However, Crawford presented no evidence in support of his section 2-619 motion to dismiss that he, in fact, posted "Chimera" to the Internet in 2011. All we have is Crawford's own, unsworn assertion that he put the document on the Internet: he does not detail where he posted it, when it was posted, how it could be accessed, or any other details about his supposed posting of the document. At this stage, his unsupported assertions are insufficient to entitle him to dismissal. Moreover, we do not even know if anyone read it. A communication of the allegedly defamatory statement to a third party satisfies the publication requirement. *Popko v. Continental Casualty Co.*, 355 Ill. App. 3d 257, 264 (2005). But simply making a material available on some corner of the Internet does not mean that the material is "published" for purposes of a defamation claim. Crawford's argument on this point raises more questions than it answers—questions not suitably resolved on a motion to dismiss.

¶ 50                                     2. Movie Premiere as Accrual Date

¶ 51 All defendants other than Preib in some way argue that Ciolino's claims against them accrued when "A Murder in the Park" premiered at a film festival in New York. "A Murder in the Park" premiered on November 17, 2014, at DOC NYC in New York. Defendants argue that Ciolino was required to file claims arising from statements made in "A Murder in the Park"

within one year of that film's premiere such that his April 27, 2016, filing was untimely. Ciolino, meanwhile, argues that he did not know, nor could he reasonably have known, about the film's premiere in New York. He argues that he had one year to file his claims relating to "A Murder in the Park" after it premiered in Chicago on July 15, 2015, so his April 27, 2016 filing was timely.

¶ 52    As stated above, the statute of limitations for defamation and false light claims generally accrues at the point that the statements are published. *Moore*, 402 Ill. App. 3d at 73. While we have previously acknowledged that there is some uncertainty about what circumstances should cause us to apply the discovery rule in defamation cases, we have explained that we will not ordinarily apply the discovery rule in defamation cases unless the publication is hidden, inherently undiscoverable, or inherently unknowable. *Peal v. Lee*, 403 Ill. App. 3d 197, 207 (2010); see also *Tirio v. Dalton*, 2019 IL App (2d) 181019, ¶ 69. Defamation via mass-media publications, including magazines, books, newspapers, radio, and television programs are not subject to the discovery rule because they are readily accessible to the general public. See *Tom Olesker*, 61 Ill. 2d at 137-38.

¶ 53    DOC NYC, where "A Murder in the Park" premiered, bills itself as "America's largest documentary film festival." Several articles were written in publications about the premiere of "A Murder in the Park" near the time that the film premiered. For example, before or at the time the film premiered, marketing and promotional materials for "A Murder in the Park" appeared on social media and on the websites of the national publications *Variety* and *Fox News*. Several articles mentioning the film were also posted on the websites of local publications. Christopher Rech, the producer of "A Murder in the Park," submitted a declaration in support of the motions to dismiss stating that the film was not concealed from the public in any way and, in fact, the film was actively marketed and advertised in order to maximize public interest in the film.

¶ 54    Although Illinois courts have sometimes implied that the discovery rule does not apply to defamation claims because the date of publication is the date that matters, it is clear that our supreme court has not ascribed to such a bright-line rule. In fact, in the supreme court's seminal case on the issue, *Tom Olesker*, the court had "no hesitation" in applying the discovery rule to hold that the plaintiff's cause of action accrued when the plaintiff knew or should have known about the existence of the allegedly defamatory material. *Id.* at 136-37.

¶ 55    The *Tom Olesker* court distinguished the case before it from those in which the alleged defamation was easily discoverable due to its mass media publication. *Id.* at 137-38. But when a plaintiff does not know and cannot reasonably know about the existence of material defaming him, the cause of action accrues at the time the plaintiff knows or should know that the defamatory material exists. *Id.* at 136-37. The question before us is not whether the discovery rule can be applied to a defamation claim, the question is whether, under the circumstances presented, the nature of the publication was such that knowledge sufficient to trigger the statute of limitations should be imputed to Ciolino because of the putative availability of the information.

¶ 56    The parties' dispute, thus, turns on whether the premiere of "A Murder in the Park" in New York, along with the attendant press coverage, was a sufficiently prominent medium that it could be equated to a mass media publication that would proscribe the application of the discovery rule. We find that, when construing the record in favor of Ciolino and viewing the circumstances in a light most favorable to him, there is at least a question of fact regarding

whether the film's premiere in New York was sufficient to start the limitations clock on his claims.

¶ 57    In *Tom Olesker*, the supreme court's comment on when the discovery rule would not be applicable for a defamation claim was for situations where "the publication has been for public attention and knowledge and the person commented on, if only in his role as a member of the public, has had access to such published information." *Id.* at 138. Apparently neither Ciolino nor anyone other than those in the theater on November 17, 2014, had access to the allegedly defamatory statements that were published that day, or at least that is an unresolved fact question. The film and its specific content were not released to the general public in any way. Unlike mass media publications that are available for anyone to obtain at any time, the premiere of "A Murder in the Park" was for a relatively small number of people at an event 800 miles away from the allegedly defamed subject. The content of the film was undiscoverable to any unwitting member of the general public at that time, including Ciolino. He could not have known that he was harmed at that time.

¶ 58    Even in *Winrod v. Time, Inc.*, 334 Ill. App. 59 (1948), on which defendants rely for support, the court's holding that the statute of limitations began running immediately upon publication was based upon the fact that that the allegedly defamatory material was circulated to the general public and was widely available. The *Life* magazine at issue in that case "appeared for sale on newsstands throughout the country" with "thousands of copies widely distributed," so the court held that the statute of limitations began to run " 'upon the first publication, when the issue [went] into circulation generally.' " *Id.* at 60-64. But *Winrod* was still based on the fact that there was a "general release of the magazine[,] *** completed throughout the nation." *Id.* at 65; see also 54 C.J.S. *Limitations of Actions* § 229 (2010) ("Where a cause of action is based upon a defamatory matter appearing in a publication, the statute of limitations commences to run upon the first *general distribution of the publication to the public ***.*" (Emphasis added.)).

¶ 59    At this stage of the case, where all inferences must be drawn in his favor, Ciolino is situated much more like the plaintiff in *Tom Olesker* than he is the plaintiff in *Winrod*. When we take plaintiff's allegations as true and view the evidence in a light most favorable to him, Ciolino can be more neatly analogized to the allegedly defamed plaintiff in *Tom Olesker*, who did not and could not have known about the publication of the material about him, than to the plaintiff in *Winrod* who was allegedly defamed through the circulation of thousands of articles on a national stage. The film in this case was not shown to the "general public" when it premiered as some defendants suggest. It was shown to a small audience in one city and was available for a couple of hours.

¶ 60    Even the viewers of "A Murder in the Park" at the film festival in New York are more like the subscribers at issue in *Tom Olesker* than they are like the general public in *Winrod*. Those who saw "A Murder in the Park" at the film festival were a small, select group of people. The select group of people is from another small subset of the population—attendees of the 2014 DOC NYC film festival. According to Ciolino, if the film only showed that one time, he very likely would have never learned of its existence.

¶ 61    As far as we can tell from the record, even if Ciolino wanted to see "A Murder in the Park" before it premiered in Chicago, he would have had no reasonable way to do so. And that is among the litany of factual issues that are currently unresolved. Defendants stressed during the oral argument in this case that we should not even look to the discovery rule because the film

- 12 -

was not hidden and its existence was not inherently unknowable. Even in that context, however, factual considerations may operate to preclude the dismissal of a plaintiff's claim. See *Mitsias v. I-Flow Corp.*, 2011 IL App (1st) 101126, ¶¶ 29, 52 (a limitations period for a plaintiff's cause of action should generally not begin to run and expire at a time when the injury is unknowable); *United States v. Kubrick*, 444 U.S. 111, 116 (1979) (where a plaintiff's cause of action might be undiscoverable through reasonable diligence, the limitations period may be tolled). All inferences must be drawn in Ciolino's favor at this stage of the case, and defendants have not presented evidence on all points to counteract the effect of those inferences.

¶ 62     When we are dealing with the statute of limitations, if only one conclusion can be drawn from the undisputed facts, the question of the timeliness of the plaintiff's complaint is for the court to decide; otherwise it is a question of fact. *Heredia v. O'Brien*, 2015 IL App (1st) 141952, ¶ 24. We cannot say, as a matter of law, that the allegedly defamatory statements at issue here were "easily discovered, and delivered to a mass sector of the public" (*Blair*, 369 Ill. App. 3d at 326) nor that the circumstances are otherwise such that any claims arising from the allegedly defamatory statements must have accrued immediately when the film was screened in New York. See *Gadson v. Among Friends Adult Day Care, Inc.*, 2015 IL App (1st) 141967, ¶ 14 (a section 2-619 motion to dismiss seeks a summary disposition when a plaintiff's claim is defeated as a matter of law or on the basis of easily proven facts). And even though the existence of the film was not necessarily hidden, there are questions about what Ciolino could have possibly discovered even if he was completely diligent. The evidence currently in the record does not establish *what* Ciolino could have known about the film and the specific statements therein or *when* he could have learned about those matters or otherwise gained sufficient knowledge to take action on the claims asserted here.

¶ 63     We are aware of the fact that, after its premiere, "A Murder in the Park" was sold to Showtime and has been broadcast nationally and become available on several nationwide streaming services. A nationally available movie or television program is tantamount to the nationwide circulation of a magazine like in *Winrod* and would undoubtedly cause the statute of limitations to run. But Ciolino filed his claim within one year of "A Murder in the Park" having any national run.

¶ 64     One of the stated reasons the supreme court had "no hesitation" in applying the discovery rule in *Tom Olesker* was to prevent cases where plaintiffs were "silently wronged." *Tom Olesker*, 61 Ill. 2d at 136-37. A ruling in favor of defendants here would promote silent wrongs in the future rather than preventing them. People would have to be timelessly devoted to searching out whether anyone was spreading harmful untruths about them anywhere in the world. The statute of limitations is supposed to compel plaintiffs to act reasonably to discover harms against them. Statute of limitations jurisprudence revolves around the idea that, when a person has sufficient information or is deemed as a matter of law to have such information, then he must act. If a plaintiff turns a blind eye to harms against him, he can lose his cause of action. If a plaintiff should discover some harm against him, but does not, then he can lose his cause of action. But the statute of limitations is not intended to serve as a refuge for defendants in instances in which a plaintiff does not act solely because he does not and could not reasonably discover a harm against him.

¶ 65     We also must draw a distinction between the publicity defendants generated with an eye toward drawing attention to the *film itself* on the one hand and the ability to know about the allegedly defamatory *statements* therein on the other. In the cases where the mass media

- 13 -

exception has been recognized, it is because the allegedly defamatory statements themselves were on display for all to view. Here, knowledge of the film's existence is not the same as knowledge of the statements therein. So even if defendants drew attention to the film itself to generate publicity and viewership, that does not mean, as a matter of law, that Ciolino must be charged with knowledge about the specific statements made about him in the film.

¶ 66 Courts have applied the discovery rule on a case-by-case basis, weighing the relative hardships of applying the rule to both plaintiffs and defendants. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 78 (1995). As has been recognized repeatedly, the purpose of the statute of limitations is to discourage the presentation of stale claims and to encourage diligence in the bringing of actions. *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 265-66 (2001). At this point, there is no claim of any want of diligence on the part of the plaintiff in this case, nor is there any assertion that there are discernable increases in problems of proof so far as defendants are concerned. See *Tom Olesker*, 61 Ill. 2d at 133. We think there would be a significant hardship on plaintiffs if we were to enforce, as a matter of law, a duty to discover and sue for any potentially defamatory statements made anywhere on earth within a year, regardless of the plaintiff's ability to learn about the statements. At least in this case, we see no similar significant hardship on a defendant that might arise due to the passage of time.

¶ 67 When the record is construed in Ciolino's favor, diligence was shown here. Ciolino filed his claims within 19 months of the New York premiere and within 9 months of the Chicago premiere. There is no indication that Ciolino was sitting on his rights. Ciolino filed these claims two months after the documentary aired nationally on Showtime. In this case, the interests of justice and the interest in preventing stale claims would not be furthered by barring Ciolino's claims on limitations grounds.

¶ 68 This case is also different than some of the cases discussed by the parties in which a court was tasked with determining whether the statute of limitations accrues simply by virtue of the allegedly defamatory statement being posted online. Here, only references to the film were made online, on social media, and in the news articles that reference the premiere of the film. The articles discuss the subject matter of the film to varying degrees, but none of the articles carry the specific statements that Ciolino claims to be defamatory. The film itself and the allegedly defamatory statements themselves were not available online or to the public generally until much later, by which time plaintiff sued within one year. Accordingly, based on the record as it is currently developed, we find that Ciolino's claims for defamation did not, as a matter of law, accrue when the film premiered in New York.

¶ 69                                   3. Alvarez—Press Conference

¶ 70 Defendant Anita Alvarez argues that Ciolino's claims against her are time barred because they are based on comments that she made at a televised news conference on October 30, 2014. Ciolino's claim for defamation against Alvarez is for the inclusion of certain statements she made at a press conference where the footage was reproduced in "A Murder in the Park." However, because the allegedly defamatory statements are simply a republication of publicized statements that Alvarez made more than a year before Ciolino filed suit, we agree that the claims against Alvarez are time barred.

¶ 71 The allegedly defamatory statements that Ciolino claims Alvarez made in "A Murder in the Park" were simply clips from a news conference she held on October 30, 2014. The news

- 14 -

conference was widely reported upon in Chicago and nationally when it occurred. Alvarez did not appear in "A Murder in the Park" to give any new commentary or make any other statements about the case or about Ciolino.

¶ 72    At the news conference announcing the abandonment of charges against Simon, Alvarez stated that the "investigation by David Protess and his team involved a series of alarming tactics that were not only coercive and absolutely unacceptable by law enforcement standards, they were potentially in violation of Mr. Simon's constitutionally protected rights." Alvarez continued, expressing that, in her view, "the original confession, made by Alstory Simon and the coercive tactics that were employed by investigator Ciolino have tainted this case from the outset and brought into doubt the credibility of many important factors." She concluded that "[t]he bottom line is that the investigation conducted by Protess and private investigator Ciolino, as well as the subsequent legal representation of Mr. Simon, were so flawed that it is clear that the constitutional rights of Mr. Simon were not scrupulously protected as our law requires. This conviction therefore cannot stand." The "A Murder in the Park" filmmakers included those clips in the film.

¶ 73    The press conference Alvarez held was reported upon by every major Chicago news organization the day that it happened. It was also reported upon by national news organizations such as the Associated Press, USA Today, and Reuters. Both local and national news articles about the press conference quote Alvarez's allegedly defamatory statements about Ciolino, at least in part. The statements were made in Chicago. In fact, on the day of Alvarez's news conference, Ciolino released a statement in response. See, *e.g.*, Sarahtr, *In Stunning Reversal, Alstory Simon, Convicted in Double Murder, Released From Custody*, Chi. Sun-Times (Oct. 30, 2014), https://chicago.suntimes.com/2014/10/30/18422250/in-stunning-reversal-alstory-simon-convicted-in-double-murder-released-from-custody [https://perma.cc/SRX7-NSNH]. In the wake of the backlash of Simon's release and the criticism of his work, Ciolino replied that he still believed Porter was innocent. Ciolino stated that he stood by his work, explaining that "Mr. Simon confessed to a Milwaukee TV reporter, his own lawyer and others since he confessed to me. You explain that." *Id.* Ciolino also reiterated his belief that, "[b]ut for the work we did together with Northwestern and the students, Porter's life would have been taken."

¶ 74    Unlike the claims against Crawford for *Justice Perverted*, the claims based on comments Alvarez made at the news conference are subject to the single publication rule. The single publication rule is that "[n]o person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance." 740 ILCS 165/1 (West 2016). Under this rule, defamation and privacy actions are complete at the time of the first publication, and any subsequent appearances or distributions of copies of the original publication are of no consequence to the creation or existence of a cause of action. *Blair*, 369 Ill. App. 3d at 324-25. Ciolino's claims against Alvarez accrued on October 30, 2014, and the rebroadcast of video clips from the news conference in "A Murder in the Park" cannot, as a matter of law, create a new cause of action.

¶ 75    It is obvious that Ciolino knew about Alvarez's press conference and the statements made therein. He responded to them directly in a publicly released statement the same day. Both local and national news outlets reported on Ciolino's statement. The fact that Alvarez's statements were later reproduced in "A Murder in the Park" is insufficient to give rise to a new cause of action. Alvarez is not even the one who reproduced the statements. Therefore, because Alvarez's allegedly defamatory statements were made on October 30, 2014, and Ciolino knew

about them that same day, but did not file his claims against her until April 27, 2016, Ciolino's claims against Alvarez are time barred.

¶ 76                                4. Preib's Arguments and Defendants' Other Arguments for Dismissal

¶ 77      Defendant Martin Preib does not rely on the statute of limitations to argue that we should affirm the dismissal of the claims against him. Ciolino seeks to hold Preib responsible for blog posts that he made on the blog "Crooked City: The Blog About the Wrongful Conviction Movement." The statements that Preib allegedly made on the blog for which Ciolino seeks to recover were made between June 2015 and April 2016. Because Ciolino filed his claims in federal court on April 27, 2016, there is no issue as to timeliness. So Preib raises other arguments that he contends entitle him to dismissal. The other defendants raise the same arguments as Preib as alternative bases for affirming the dismissal of Ciolino's claims should we reject their position on the statute of limitations.

¶ 78      Defendant Preib and all of the other defendants argue that, even if the claims against them are not time barred, the dismissal of the claims should nonetheless be affirmed on other grounds. The trial court ruled solely on the statute of limitations arguments the parties raised and, in its written order, did not analyze any of the other possible grounds for dismissal that the parties raised then and now raise again here. Defendants point out that, even though the trial court dismissed the claims for one reason, we can affirm the dismissal of Ciolino's claims for any basis in the record. See *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 40.

¶ 79      Defendants all argue in different ways that we should affirm the dismissal of Ciolino's claims against them because the allegedly defamatory statements constitute inactionable opinion. Only statements capable of being proven true or false are actionable for defamation; opinions are not. *Moriarty v. Greene*, 315 Ill. App. 3d 225, 233 (2000). Defendants contend that the statements attributed to them that Ciolino alleges are defamatory are open to interpretation and merely represent their opinions of Ciolino and his conduct.

¶ 80      Defendants all also argue that the allegedly defamatory statements are covered by the fair reporting privilege. The fair report privilege protects a defendant from a defamation action when the defendant reports information obtained from governmental and public proceedings on matters of public interest. *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 572 (2003); see also 33A Ill. L. and Prac. *Slander and Libel* § 31 (2012). Defendants contend that their works are based on court records and principally on Simon's postconviction filings, such that they cannot be liable for defamation for repeating the statements made therein.

¶ 81      While defendants are correct that we may affirm on any grounds present in the record, we similarly may decline to search beyond the trial court's analysis to find some basis for its decision. See *Allstate Insurance Co. v. Davenport*, 309 Ill. App. 3d 750, 756 (1999); *Nolan v. Johns-Manville Asbestos & Magnesia Materials Co.*, 74 Ill. App. 3d 778, 796 (1979). This case is an appropriate time for us to exercise such restraint. Defendants acknowledge that the trial court made errors in its written order, but they essentially ask that we step in and serve the trial court's function. We decline to do so.

¶ 82      Even though some of the questions presented by defendants are questions of law that we would review *de novo* on appeal, we remain a court of review. Defendants ask us to consider a number of matters and pass upon them even though no lower court has considered or analyzed the issues. There are a number of thorny issues raised in the parties' arguments that the trial court did not reach but that defendants want us to reach.

¶ 83    For example, there are questions raised regarding whether defendants abused the fair reporting privilege and, therefore, lost the benefit to claim it. For the fair reporting privilege to apply, the statements must be a fair and accurate representation of the proceedings reported upon. *Missner*, 393 Ill. App. 3d at 761. If not, the privilege does not apply. *Id.* Ciolino argues that "A Murder in the Park" is not a fair and accurate representation of the proceedings, and he points to discrepancies he believes exist. The defendant-filmmakers, on the other hand, argue that their film fairly describes the events as reported in police files and court records and, thus, their work is protected. To make matters more complicated, the fair reporting privilege is a qualified one. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 585 (2006). It typically does not bar claims; it simply enhances a plaintiff's burden of proof in proving up a defamation action. *Lykowski v. Bergman*, 299 Ill. App. 3d 157, 166 (1998).

¶ 84    There are also questions about whether particular statements are properly characterized as fact or opinion and whether such statements can be innocently construed. The parties each strenuously press their respective cases: Ciolino that he is seeking recovery for expressions of false facts and defendants that they were merely expressing their opinions or advocating for Simon. There are several considerations courts must take into effect when determining whether statements are factual and can therefore be evaluated for defamation or whether the statements are nonactionable opinions. *Hopewell v. Vitullo*, 299 Ill. App. 3d 513, 518-21 (1998); *Brennan v. Kadner*, 351 Ill. App. 3d 963, 969-71 (2004).

¶ 85    The parties also raise questions about whether the statements can be considered "highly offensive to a reasonable person" to support a claim for intentional infliction of emotional distress. As this issue pertains to Preib, the trial court's ruling is inconsistent. At one point in its order, the trial court finds that Ciolino pled sufficient facts to state a claim for intentional infliction of emotional distress against Preib. At another point, the trial court finds that Ciolino's claim is insufficient because his "statements thus do not rise to the required level of 'extreme and outrageous conduct.' " It is clear from the trial court's ruling as a whole that it found the claims against Preib to be time barred. The trial court stated, in analyzing Preib's motion to dismiss, that "[a]ny claims [against Preib] based on statements published before January 2016 are thus time-barred." That ruling was in error.

¶ 86    The trial court is the appropriate forum for these issues to be hashed out for the first time. Discovery may well shed light on these matters and provide the trial court or this court with a better opportunity to adjudicate these issues that are no doubt significantly important to the overall resolution of the case. We express no opinion about the quality of defendants' arguments or their likelihood of success. The grounds for a favorable ruling that defendants raise including and in addition to the statute of limitations may well entitle them to a judgment of no liability, and defendants are entitled to raise these matters at a later stage in the proceedings. But this court is a court of review, and we decline to be the first tribunal to consider and rule upon these important disputed issues.

¶ 87                              B. Intentional Infliction of Emotional Distress

¶ 88    The trial court found that, under section 2-615, Ciolino pled sufficient facts to state a cause of action for intentional infliction of emotional distress against all defendants. The court denied defendants' motions to dismiss in that regard. The trial court held that the claims were nonetheless barred by the two-year statute of limitations governing personal injury actions in Illinois (citing *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278 (2003)).

¶ 89    As stated above (*supra* ¶¶ 41-68), the claims against defendants are not barred by the one-year statute of limitations governing defamation actions, so they are similarly not barred by the two-year statute of limitations governing actions for intentional infliction of emotional distress. Even if, as defendants argue, the statute of limitations for Ciolino's intentional infliction of emotional distress claims is one year as a derivative of his defamation claims (citing *Hammond v. North American Asbestos Corp.*, 97 Ill. 2d 195, 208-09 (1983)), the claims are still timely.

¶ 90    The trial court apparently failed to apply the savings statute to Ciolino's claims. The trial court found that the operative filing date for these claims was in January 2018—when Ciolino filed this case. But when Ciolino filed this case he was refiling the claims that were dismissed for lack of jurisdiction in federal court. The Illinois savings statute states that, where an action is dismissed by a United States District Court for lack of jurisdiction, then, regardless of whether the statute of limitations has run during the pendency of the action, the plaintiff may commence a new action in state court within one year of the dismissal or within the remaining period of limitation, whichever is greater. 735 ILCS 5/13-217 (West 2016); see also *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 105-06 (1996). For limitations purposes, the operative filing date for Ciolino's claims in this case is April 27, 2016—when Ciolino filed these claims in federal court.

¶ 91    Defendants also argue that Ciolino failed to plead the facts necessary to state a cause of action for intentional infliction of emotional distress. But the trial court denied defendants' motions under section 2-615. The trial court found that Ciolino had sufficiently stated facts to support his cause of action. None of the defendants appeal that adverse ruling. Defendants again want us to go far beyond the trial court's order and to reach a variety of arguments for the first time on appeal. We decline to do so.

¶ 92    As for Preib, and as discussed above (*supra* ¶ 85), the trial court's order is inconsistent. The order states that Ciolino pled sufficient facts against Preib to state a cause of action for intentional infliction of emotional distress. That ruling implies that Ciolino sufficiently pled that Preib's conduct was extreme and outrageous. To prevail on a claim of intentional infliction of emotional distress, the plaintiff must prove the following three elements: (1) that the defendant's conduct was truly extreme and outrageous, (2) that the defendant either intended that his conduct would cause severe emotional distress or knew that there was a high probability that his conduct would do so, and (3) that the defendant's conduct did in fact cause severe emotional distress. *Taliani v. Resurreccion*, 2018 IL App (3d) 160327, ¶ 26. The trial court found, in denying the section 2-615 part of defendants' motions, that Ciolino had pled sufficient facts to support those elements of the cause of action. The trial court then found that the alleged conduct did "not rise to the required level of extreme and outrageous conduct." The findings cannot be reconciled. The trial court then went on to ultimately find the claims to be time barred. Any finding that the allegations were not sufficient was not a stated basis for the trial court's ruling and cannot serve as a basis to affirm the dismissal of the claims against Preib.

¶ 93    As for Alvarez, we conclude that Ciolino's claims are time barred. The only conduct Ciolino alleges that Alvarez engaged in that could subject her to liability is not actionable as an independent claim. Ciolino's other allegations regarding intentional infliction of emotional distress refer to Alvarez's official actions in dealing with Simon's case. They do not relate to

any action toward Ciolino. Accordingly, Ciolino has no claim against Alvarez for intentional infliction of emotional distress.

¶ 94 Per the notice of appeal in this case, the only issue currently on appeal is whether the trial court properly granted judgment to defendants under section 2-619. Ciolino's notice of appeal states that "Plaintiff respectfully requests that the reviewing court reverse the Court's order dismissing Plaintiff's complaint pursuant to 2-619." Thus, we do not revisit the trial court's rulings on the section 2-615 portions of defendants' motions. The trial court erred when it dismissed Ciolino's claim for intentional infliction of emotional distress as time barred.

¶ 95                                                  C. Conspiracy

¶ 96 Defendants argue that Ciolino abandoned his conspiracy claim by failing to argue about the propriety of the dismissal of that claim on appeal. At first impression, defendants' position seems persuasive—that the trial court's dismissal of plaintiff's claim for conspiracy should stand because Ciolino forfeited that claim by failing to argue on appeal that its dismissal was improper. However, Ciolino has persuaded us that he did, in fact, dispute the dismissal of his conspiracy claim on appeal. Ciolino has not abandoned his claim sounding in conspiracy, and accordingly, we reinstate his conspiracy claim so that he may pursue it on remand.

¶ 97 The trial court dismissed Ciolino's claim for conspiracy on the basis that the underlying torts supporting the alleged conspiracy were time barred, so the conspiracy claim was time barred too (citing *Mauvais-Jarvis v. Wong*, 2013 IL App (1st) 120070, ¶¶ 109-11). As we have explained above, defendants did not prove that the tort claims underlying the alleged conspiracy were time barred, so the trial court's justification for dismissing the conspiracy claim is not valid.

¶ 98 On appeal, plaintiff argued that *all* of his claims were dismissed improperly. Plaintiff argued in his opening brief, and thoroughly in his reply brief, that his conspiracy claim was timely—counter to the trial court finding otherwise. Specifically, plaintiff stated that "[b]ecause Plaintiff's defamation, false light, and IIED claims are timely" (as we have found above) "and adequately pled, Plaintiff's civil conspiracy claim survives summary dismissal." Now finding that plaintiff did not abandon his claim for conspiracy, we reverse the trial court's dismissal of plaintiff's conspiracy count as well, as it was not time barred.

¶ 99                                               III. CONCLUSION

¶ 100 Accordingly, we affirm in part and reverse in part. We affirm the trial court's dismissal as to defendant Anita Alvarez. We reverse all the trial court's other rulings on the motions to dismiss, reinstate all claims against the other defendants, and remand the case for further proceedings not inconsistent with this opinion.

¶ 101 Affirmed in part, reversed in part, and remanded.